COMMONWEALTH *vs.* JUAN SANTOS QUINONES.

No. 09-P-435.

Hampden. February 2, 2010. - November 8, 2010.

Present: CYPHER, BROWN, & RUBIN, JJ.

*Robbery. Joint Enterprise. Practice, Criminal,* Required finding. *Evidence,* Joint venturer, Prior misconduct.

At the trial of indictments charging, inter alia, armed robbery while masked, in which the Commonwealth proceeded on a theory of joint venture, the judge properly denied the defendant's motion for a required finding of not guilty, where, viewed as a whole, the evidence was sufficient to support the jury's finding beyond a reasonable doubt that the defendant knew his coventurers would be both armed and masked during the robbery. [218-222]

At a criminal trial, the defendant's testimony during cross-examination regarding an incident that took place prior to the crime for which he was charged, i.e., that the defendant had taken money from his daughter's piggy bank, did not create a substantial risk of a miscarriage of justice. [222-223]

INDICTMENTS found and returned in the Superior Court Department on August 28, 2007.

The cases were tried before *Constance M. Sweeney,* J.

*Susan E. Taylor* for the defendant.

*Dianne M. Dillon,* Assistant District Attorney, for the Commonwealth.

RUBIN, J. After a jury trial in the Superior Court, the defendant, Juan Santos Quinones, was convicted as a joint venturer of assault and battery, see G. L. c. 265, § 13A, armed robbery while masked, see G. L. c. 265, § 17, and assault by means of a dangerous weapon, see G. L. c. 265, § 15B(*b*). He now appeals.

1. *Background.* Viewing the evidence presented at trial in the light most favorable to the Commonwealth, see *Commonwealth v. Latimore,* 378 Mass. 671, 676-677 (1979), the jury could have found the following facts. On the evening of August 5, 2007, the defendant telephoned Jose Lebron and told him to

come to the defendant's house, at 30 Elmdale Street in Springfield, because they had "to do something." Lebron was about fifteen minutes away, and arrived at the house, which comprised two apartments, at approximately 9:30 P.M. He was met there by his younger brother Angel Lebron, Jonathan (Jay) Casiano, and the defendant. Angel was instructed to leave. Lebron, Casiano, and the defendant sat on the front porch, where the defendant informed Lebron that the three of them were going to rob a nearby Cumberland Farms convenience store and divide the money. The three men had a conversation about how they were going to perform the robbery, and Lebron understood that his role was "to go in with them and to hold the knife."

At some point in the evening, while still on the defendant's front porch, Casiano provided Lebron with two sweaters and a large hunting knife. Casiano fashioned one sweater around Lebron's head as a makeshift mask. The second sweater provided by Casiano had been modified: thumb holes had been cut into the sleeves so that the material would cover Lebron's fingers and hands when worn. Casiano donned a similar, modified sweater and a mask made from cutting eye holes in a shirt sleeve. Both men also put on hats. The defendant was present when Lebron and Casiano dressed for the robbery.

At approximately 2:30 A.M., Lebron, Casiano, and the defendant left the porch together. While the defendant mounted a bicycle and began to ride back and forth on the street in front of his house, Lebron and Casiano stopped briefly in the defendant's driveway, where Casiano removed a shiny metal object from a bag. Lebron, Casiano, and the defendant then proceeded together up the street, toward the Cumberland Farms — Lebron and Casiano on foot, the defendant on the bicycle. Lebron and Casiano entered the driveway at 21 Elmdale Street, which abuts the rear of the Cumberland Farms property. The defendant remained on his bicycle in the street, where he had a view of the driveway.

The three men were observed by Brytnee Woods, a neighbor of the defendant and the girlfriend of Lebron's brother Angel. Believing that something bad was going to happen and trying to stop Lebron, she walked down to the driveway at 21 Elmdale. By the time she arrived, Casiano had already scaled the chain

link fence separating the driveway from the store. As Woods spoke to Lebron in the driveway, a resident of 21 Elmdale came outside and began speaking to Casiano through the fence. Eventually, both Lebron and Casiano returned to the defendant's front porch and Woods returned home. At some point thereafter, the defendant went and sat in front of a Dunkin' Donuts establishment that was across the street from the front entrance of the Cumberland Farms. The defendant called Lebron on his cellular telephone and told him that "it was fine out front, that there was no cop."

Shortly after 3:00 A.M., Sylvia Walker, a Cumberland Farms employee in her late fifties, and a neighbor of the defendant, went outside the store and sat on some milk crates to eat a meal during her break. As she sat down, Lebron and Casiano came up behind her, one of them putting a gun to her head. They told her not to move or turn around. Walker recognized the voice of the gunman as that of Casiano, who worked across the street at the Dunkin' Donuts and was a frequent customer of the convenience store. Thinking it was a joke, she told him, "Jonathan, stop playing."

Casiano grabbed Walker by the shirt and pulled her toward the back of the store. When she fell to the ground, hitting her knees, Casiano dragged her by her shirt. As Walker was being dragged, her shirt was pulled up around her neck, and eventually rose up around her hands. Casiano tied her by her wrists to a chain link fence behind the store, leaving her topless with her shirt still above her head. He then gagged her. Casiano ran the gun over her face and head, and cocked it, putting it to the back of her head. During this time, Lebron received another call from the defendant. Lebron handed the phone to Casiano, who was given the signal that it was okay to enter the store.

The two men entered the Cumberland Farms through a side door and encountered a second employee, Robert Plaine, who was putting away a delivery. Casiano put the gun to Plaine's head and instructed him to open the registers. Plaine, too, recognized Casiano's voice. Plaine opened the cash registers, the drawers of which contained about $160 in cash, mostly in small bills, and some change. Casiano instructed Plaine to lie on the ground or "I'll kill you." Lebron and Casiano then grabbed the trays from the cash register drawers and fled the

store. Once the robbers left, Plaine called 911 and then went to find Walker.

In the interim, however, Walker had managed to free herself from the rope Casiano had used to tie her to the fence. She had run to the Dunkin' Donuts across the street for help. She saw the defendant, whom she recognized from his daily visits to her store, sitting outside. He said, "I'm here to help. I'm going to help you," and assisted her in removing the gag from around her neck and putting her shirt back on. She then went inside the Dunkin' Donuts and asked the employees there to call 911. She recalls that, as she sat inside the Dunkin' Donuts crying, the defendant was standing outside the window, talking on his cellular telephone; she thought he was calling the police. Meanwhile, Lebron and Casiano once again scaled the fence behind the Cumberland Farms and ran with the cash register trays to the defendant's house.

The police were able to follow a trail of pennies from the driveway at 21 Elmdale Street, immediately behind the Cumberland Farms, to the porch of the defendant's home at 30 Elmdale Street. After further investigation, including obtaining a statement from Lebron, police obtained and executed a search warrant for the defendant's home, where, in the defendant's apartment, they found clothing that resembled the clothing worn by the assailants. In a common basement, accessible to both apartments in the house, the police recovered two plastic cash register trays in the dirt, loose pennies, and a handwritten note that matched the description of a note that had been in one of the drawers of the trays taken from Cumberland Farms. They also found a silver BB gun that resembled a nine millimeter semi-automatic pistol.

2. *Discussion.* The defendant makes two contentions on this appeal: first, that the Commonwealth presented insufficient evidence of the defendant's knowledge that the principals in the robbery, Lebron and Casiano, would employ weapons and masks, and thus his motion for a required finding of not guilty on the armed robbery charge was improperly denied[1]; second, that the

---

[1]At trial, the defendant also moved for a required finding of not guilty on the charge of assault and battery. He does not challenge on appeal the denial of that motion.

Commonwealth impermissibly elicited evidence of a prior bad act of the defendant, resulting in a substantial risk of a miscarriage of justice with respect to all three convictions. Neither contention is persuasive.

a. *Sufficiency of the evidence.* We review the denial of the defendant's motion for a required finding of not guilty to determine whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Commonwealth* v. *Latimore*, 378 Mass. at 677, quoting from *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979). Proof beyond a reasonable doubt may be established by evidence that is entirely circumstantial, and the inferences a jury may draw from the evidence need only be reasonable and possible, not necessary or inescapable. See *Commonwealth* v. *Linton*, 456 Mass. 534, 544 (2010). To support a conviction on the charge of armed robbery while masked, the Commonwealth, proceeding on a joint venture theory of the defendant's guilt, had the burden of proving that the defendant knew that the principal perpetrators of the robbery, Casiano and Lebron, would be both armed and masked. See *Commonwealth* v. *Palmer*, 59 Mass. App. Ct. 415, 424-426 (2003); *Commonwealth* v. *Leach*, 73 Mass. App. Ct. 758, 762-763 (2009). "The jury may infer the requisite mental state from the defendant's knowledge of the attendant circumstances and his subsequent participation in the offense." *Commonwealth* v. *Leach*, *supra* at 763, quoting from *Commonwealth* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979).

Our courts have long held that a defendant's knowledge that his coventurers would be armed may be demonstrated by proof of circumstances in which the need to overcome victim resistance is apparent. In *Commonwealth* v. *Ferguson*, 365 Mass. 1, 9 (1974), the Supreme Judicial Court found such circumstantial evidence sufficient to support a finding of knowledge beyond a reasonable doubt. Writing there for the court, Justice Kaplan said:

> "There was no proof of prior discussion or consultation among the actors which often appears in cases of armed

robbery or other crimes committed by multiple offenders, and provides a basis for reasoning about the participants' awareness of or intentions with respect to weapons. But there was evidence of a common venture, and a person joining in a robbery under conditions like the present, and apprehending that the intended victim might resist, could suppose that the other actors might be furnished with weapons . . . ."

*Ibid.* In light of both the defendant's and Casiano's familiarity with this particular Cumberland Farms and its employees, and given the simple nature of their plan, the jury could properly have concluded that the need to employ weapons to effectuate the robbery quickly was reasonably foreseeable to all involved. Indeed, support for a finding by the jury of knowledge here is even stronger than that in *Ferguson*, as the Commonwealth also presented evidence at trial that the defendant had a significant, if not central, role in planning the crime. Considering the span of time between Lebron's arrival and the actual crime, a jury could reasonably infer that the three men spent several hours coordinating the robbery, discussing, among other things, that Lebron's role would be "to go in" and "to hold the knife." See *Commonwealth* v. *Netto*, 438 Mass. 686, 702-703 (2003) (finding sufficient evidence of defendant's knowledge that a coventurer would be armed where the need to subdue the victim "was readily foreseeable" and "the coventurers had ample opportunity to plan the robbery together"). The Commonwealth also presented evidence that Casiano provided Lebron a large hunting knife while on the front porch of the defendant's home, and the jury would have been warranted in inferring that the defendant was present during this exchange. There was also testimony by a neighbor that, while standing in the defendant's driveway, Casiano was holding a shiny object, potentially either the knife or the gun, while the defendant was riding his bicycle in the street nearby.[2] The totality of the evidence, viewed in the light most favorable to the Commonwealth, was sufficient to

_____

[2] The defendant contends that this testimony contradicts Lebron's testimony that he was provided with the hunting knife on the defendant's porch, and thus renders unreasonable the inference that the provision of the knife occurred in the defendant's presence. This contention ignores the possibility that

support the jury's finding beyond a reasonable doubt that the defendant knew that his coventurers would be armed during the robbery.

The defendant's knowledge that his coventurers would be masked stands on similar footing. There is, to begin with, the evidence that the defendant was the primary motivator for the robbery and that he participated centrally in its planning. The jury could infer that such planning included planning to conceal the coventurers' identities. This is particularly so because Casiano was so well known to the employees of the Cumberland Farms. In preparation for the robbery, the defendant, Casiano, or both, modified clothing to conceal the principals' identities, further supporting the inference of advance planning. Lebron and Casiano wore sweaters with thumb holes cut into the sleeves, and Casiano wore a makeshift mask with cut-out eye holes.

Further, there is evidence that both principals dressed for the robbery in the presence of the defendant, though there was no evidence that they then put on their masks. Lebron testified that Casiano had provided the sweaters, one of which was to be Lebron's mask, while on the defendant's porch, again supporting an inference that the provision occurred in the presence of the defendant. There was also evidence that the defendant rode his bicycle down the street with his coventurers when they initially approached the back of the Cumberland Farms (which was en route to the Dunkin' Donuts, where the defendant went to act as lookout), fully prepared for the robbery, when they would have been in possession of their masks.[3]

Even in the absence of direct evidence that the defendant saw

the shiny object Casiano held was the gun, not the hunting knife, that the occurrence in the driveway was not the same transfer to which Lebron testified, and that the object, visible to a neighbor from across the street, might also have been visible to the defendant from his bicycle. We also reiterate that, in the event of contradiction, jurors are free to believe or disbelieve the testimony of each witness in whole or in part, Commonwealth v. Zanetti, 454 Mass. 449, 457 (2009), and that, when considering the evidence presented in the light most favorable to the Commonwealth, we therefore "do not weigh the supporting evidence against conflicting evidence, nor do we consider the credibility of the witnesses." Commonwealth v. Bacigalupo, 455 Mass. 485, 489 (2009).

[3]In light of Woods's testimony that Lebron and Casiano had unwrapped the shiny object moments before, and that they aborted the trip when confronted by both Woods and a resident of 21 Elmdale, the evidence in the light most

his coventurers donning or wearing the masks, the evidence as a whole, viewed in the light most favorable to the Commonwealth, is sufficient to support the jury's finding beyond a reasonable doubt that the defendant knew that his coventurers would be masked when they committed the robbery. The defendant's motion for a required finding of not guilty was properly denied.

b. *Prior bad act evidence.* At trial, the defendant took the stand in his own defense. On direct examination, he attempted to explain the trail of pennies leading to his house, asserting that they had been thrown there by his daughter and the daughters of his neighbors, who were always playing with pennies and throwing them on the ground. He also testified that this was the explanation that he had provided to the police officer who arrested him. On cross-examination, the prosecutor inquired into whether the defendant had not, in fact, provided the officer with a different, inconsistent explanation. In pursuing this line of questioning, the Commonwealth elicited testimony from the defendant that, on the day before the robbery, he had taken money from his daughter's piggy bank to purchase a cigar blunt at Cumberland Farms. The defendant indicated that this change, along with pennies that he claimed Casiano had brought to the house and that they had been counting together, had been given to a friend to purchase the cigar blunt. The friend had instead purchased the cigar blunt with her own money and had given the pennies to Jose Lebron, who scattered them as a game for the defendant's daughter and her friends. No part of this testimony was objected to. The defendant now contends that his testimony about taking money from his daughter constitutes "prior bad act" evidence that was impermissibly admitted to demonstrate his bad character and his propensity to steal.

Evidence of a defendant's prior bad acts — including non-criminal misbehavior — is inadmissible when offered to demonstrate the defendant's bad character or propensity to commit the crime charged. *Commonwealth* v. *Barboza,* 76 Mass. App. Ct. 241, 242 (2010). Such evidence "is admissible for other relevant probative purposes," *ibid.,* so long as its proba-

favorable to the Commonwealth supports the inference that Lebron and Casiano were prepared for and about to commence the robbery at the time they first approached the Cumberland Farms in the company of the defendant.

tive value outweighs any prejudice. See *Whipple* v. *Rich*, 180 Mass. 477, 479 (1902) (stating the longstanding rule that "evidence admissible for one purpose, if offered for that purpose in good faith, is not made inadmissible by the fact that it could not be used for another"). Even if we assume, however, that the specific testimony about which the defendant complains — that he had taken money from his child's piggy bank — was not properly admissible evidence relevant to exploring his prior inconsistent statement, something we do not need to decide, its unobjected-to introduction did not create a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Elam*, 412 Mass. 583, 585 (1992) (unobjected-to introduction of evidence reviewable only for substantial risk of a miscarriage of justice). The evidence of the defendant's involvement as a coventurer in the robbery was strong — including evidence of his organizing and planning the venture and of his acting as a lookout. The robbery began at the defendant's house, and the proceeds, clothing, and gun were subsequently found there. In light of all the evidence, we are persuaded that the evidence to which the defendant now objects did not " 'materially influence[]' the guilty verdict." *Commonwealth* v. *Alphas*, 430 Mass. 8, 13 (1999), quoting from *Commonwealth* v. *Freeman*, 352 Mass. 556, 564 (1967).

*Judgments affirmed.*