NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12068


COMMONWEALTH  vs.  CALVIN HORNE.



Suffolk.     October 7, 2016. - January 10, 2017.

Present:  Gants, C.J., Botsford, Lenk, Hines, Gaziano, Lowy, &
Budd, JJ.



Controlled Substances.  Evidence, Expert opinion, Relevancy and
     materiality.




Indictments found and returned in the Superior Court
Department on October 4, 2012.

The cases were tried before Linda E. Giles, J.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.


Rebecca A. Jacobstein, Committee for Public Counsel
Services, for the defendant.
Justin Florence for Massachusetts Association of Criminal
Defense Lawyers & others, amici curiae.
Teresa K. Anderson, Assistant District Attorney, for the
Commonwealth.


LENK, J.  The defendant was convicted by a Superior Court

jury of possession of cocaine with intent to distribute.  The

Appeals Court affirmed the conviction, see Commonwealth v.

Horne, 88 Mass. App. Ct. 1109 (2015), and we granted the defendant's application for further appellate review. The question before us is whether the admission in evidence of so-called "negative profiling" testimony, suggesting that the defendant did not look like a "crack" cocaine addict, gave rise to a substantial risk of a miscarriage of justice. We conclude that it did.[1]

1. Background. a. The defendant's arrest. We recite the relevant facts the jury could have found. In the early morning hours of September 14, 2012, the defendant was stopped by police on Colonial Avenue in the Dorchester section of Boston for traffic violations. The automobile that the defendant was driving was registered to a woman named Denise Barton.[2] The officer who conducted the stop, Boston police Sergeant Thomas Brooks, determined that the defendant's driver's license had

---

[1] We acknowledge the amicus brief submitted jointly by the Massachusetts Association of Criminal Defense Lawyers, the American Academy of Addiction Psychiatry, the American Society of Addiction Medicine, and the National Association of Social Workers.

[2] The vehicle had been impounded in early August of 2012, when the vehicle's owner, Denise Barton, was arrested on charges of cocaine distribution. She had given the defendant a power of attorney to have the vehicle removed from the impound lot so it would not continue to accrue charges. Approximately two weeks before the events in question, the vehicle apparently was released from the impound lot to another individual, Robert Williams, who had a prior conviction of unlawful possession of a firearm. The record does not disclose how or when the defendant ultimately came into possession of the vehicle.

been suspended. When Brooks, joined by Boston police Officer Pele James, attempted to arrest him, the defendant forcefully resisted. With the assistance of three additional officers, the defendant was subdued and placed under arrest.

Thereafter, the arresting officers found nearby a clear plastic bag containing twenty-six individually wrapped "rocks" of crack cocaine, totaling 3.87 grams. The defendant apparently had kept the bag in his boot, which came off during the melee. Later that night, Boston police Officer David Lanteigne conducted an inventory search of the motor vehicle. He found two cellular telephones and eighty-three dollars in cash in the center console of the automobile, another cellular telephone on the driver's seat, and a gun in the trunk. He did not find any drug paraphernalia.

The defendant was charged with seven offenses as a result of the stop,[3] including several gun-related charges and one count of possession of a class B substance (cocaine) with the intent

---

[3] The defendant was charged with unlawful possession of a firearm, G. L. c. 269, § 10 (h), as a subsequent offense, G. L. c. 269, § 10 (d); carrying a loaded firearm, G. L. c. 269, § 10 (n); unlawful possession of ammunition, G. L. c. 269, § 10 (h); two charges of assault and battery on a police officer, G. L. c. 265, § 13D; resisting arrest, G. L. c. 268, § 32B; and possession of a class B substance (cocaine) with the intent to distribute, G. L. c. 94C, § 32A (c), as a subsequent offense, in violation of G. L. c. 94C, § 32A (d). After the verdicts, the defendant pleaded guilty to the subsequent offense charge of possession of a class B substance (cocaine) with the intent to distribute.

to distribute, as a subsequent offense.  The jury acquitted the defendant of the firearms-related charges and convicted him of the other charges.

b.  Challenged expert testimony.  The Commonwealth notified defense counsel in advance of trial that a Boston police officer would testify as an expert to "several aspects of street-level narcotics activity including, but not limited to:  common practices and activities of street-level drug dealers, the appearance, packing, and value of street narcotics, [and] the vernacular of illegal narcotics users and dealers."  At trial, Sergeant Detective William Feeney, a supervisor in the Boston police drug control unit, testified in keeping with the notice. In addition, Feeney testified as follows:

Q.:  "And through your experience in observing and encountering . . . drug users, what are some of the characteristics that you've observed in [drug users], physical characteristics?"

A.:  "Well, depending upon what type of drug they are addicted to they have different characteristics."

Q.:  "Thank you, I'm going to ask a more specific question, if someone were addicted to crack cocaine what are some of the physical characteristics of a crack cocaine addict?"

A.:  "Somebody that's a crack cocaine user that's been using for a time, most times their physical appearance will be changed from what they probably looked like at one point, to be very --"

At that point, the defendant's counsel requested a sidebar conference at which she stated that "this [line of questioning]

is getting a little wonky for lack of a better term, what people look like when they are addicted to crack." Her "understanding from notice from the Commonwealth" was that "[the prosecutor] said [that Feeney] was going to testify to drug distribution[,] not what a drug addict looks like." The judge asked if counsel had received notice that Feeney was going to testify to signs of drug abuse and, when the defendant's counsel replied essentially in the affirmative, the judge remarked that "it's sort of common knowledge that crack addicts are going to exhibit certain physical signs and behavior," and allowed the line of questioning to continue.

The following exchange then took place:

Q.: "Sergeant Detective Feeney can you please describe for the members of the jury the crack addicts as you've observed them and in some cases arrested them, what are some of the physical characteristics that you've noted?"

A.: "Well, the majority of them you will notice them to be somewhat unkempt, very thin, physical appearances seem to be deteriorating, sometimes they'll have rotted teeth or worn down teeth from constantly grinding their teeth based on the addiction that results from the crack use."

The prosecutor then elicited testimony from Feeney concerning how much crack cocaine he typically would find when searching a crack cocaine user, the commonly used instruments of drug dealers, and the manner in which drug dealers generally package cocaine. Feeney also testified, upon looking at a photograph of

the crack cocaine in this case, that the cocaine "could be [packaged in] some ten dollar bags and . . . twenty dollar bags," suggesting an intent to distribute. At the end of his direct examination, Feeney testified that the packaging and amount of crack cocaine found near the defendant's boot, coupled with the eighty-three dollars, was consistent with an intent to distribute.

In his closing argument, the prosecutor emphasized Feeney's testimony concerning the physical characteristics of crack cocaine addicts, stating:

> "How do you know he possessed [the crack cocaine] with the intent to distribute it, does he look like a drug addict? You saw the pictures of him, drug addicts, particularly crack cocaine addicts are skinny, they are thin, they have rotted teeth, they are drawn out. He's a big man, he's a big muscular man who gave it to Sergeant Brooks quite frankly and Officer [James], and they needed assistance to get him. He is not a drug addict; he possessed it with the intent to distribute it."

The jury convicted the defendant of possession of a class B substance (cocaine) with intent to distribute.

2. Discussion. On appeal, the defendant argues that it was error to allow Feeney to testify as to the typical physical characteristics of crack cocaine addicts, maintaining that such testimony was inadmissible negative profiling evidence.

a. Standard of review. The "admission of [expert testimony] is largely within the discretion of the trial judge and he [or she] will be reversed only where the admission

constitutes an abuse of discretion or error of law."
Commonwealth v. Johnson, 410 Mass. 199, 202 (1991). Where, as
here, the objection was not preserved,[4] we review the defendant's
claim to "determine whether any error . . . created a
substantial risk of a miscarriage of justice." Commonwealth v.
Zimmerman, 441 Mass. 146, 150 (2004).[5]

b. Admissibility of negative profiling evidence. Twenty-
five years ago, we determined in Commonwealth v. Day, 409 Mass.
719, 723 (1991), that profiling testimony is inadmissible. In
that case, we addressed whether there was error in the admission
of an expert witness's testimony concerning the typical child

___

[4] Counsel's statement that Feeney's testimony was "getting a
little wonky" was not the functional equivalent of an objection,
nor did her discussion at sidebar suggest that any incipient
challenge would rest upon the impropriety of profiling evidence.
Counsel instead seemed focused on whether proper notice of the
testimony had been given. Moreover, counsel did not object to
the prosecutor's closing argument recounting the profiling
evidence now at issue.

[5] The Commonwealth also argues that, in any event, the
admission of the profiling evidence could not have caused a
substantial risk of a miscarriage of justice because the
defendant's trial counsel presented a defense of absence of
evidence of possession rather than lack of intent to distribute.
The record, however, indicates that, while trial counsel
maintained that the defendant did not possess the drugs, she
also challenged the Commonwealth's evidence that he intended to
distribute narcotics. She cross-examined Feeney on the type of
activity he typically witnessed when surveilling and arresting
drug dealers, and attempted to distinguish the defendant's
circumstances. She also argued in her closing that because the
cellular telephones in the vehicle the defendant was driving
were not ringing and the officers had not seen the defendant
making stops, "[t]here is no evidence that [the defendant] was
distributing drugs that night."

abuser. Id. The expert's so-called "child battering profile" consisted of his view of several typical characteristics associated with child abusers. Id. at 722. By introducing this evidence, the prosecutor intended to demonstrate that the defendant matched the profile. We concluded that the expert's profiling testimony was both irrelevant and prejudicial to the defendant. Id. at 723.

In determining that the profiling evidence was irrelevant, we noted that a "criminal trial is by its very nature an individualized adjudication of a defendant's guilt or legal innocence." Id. "[T]he mere fact that a defendant fits the profile does not tend to prove that a particular defendant" committed a particular offense. Id. Additionally, the use of such evidence invites a jury to conclude that because an expert identifies an accused as fitting a particular profile, "it is more likely than not that [the accused] committed the crime" (citation omitted). Id. at 723-724. In light of this, "[t]he use of criminal profiles as substantive evidence of guilt is inherently prejudicial to the defendant." Id. at 723.

The inadmissibility of profiling evidence consistently has been upheld in the intervening years. See, e.g., Commonwealth v. Federico, 425 Mass. 844, 850 (1997) ("expert may not provide profiles or testify as to the typical attributes or characteristics of the perpetrators of child abuse");

Commonwealth v. Coates, 89 Mass. App. Ct. 728, 735-737 (2016) (sex abuser profile inadmissible); Commonwealth v. Poitras, 55 Mass. App. Ct. 691, 694 (2002) (admission of child abuser profile erroneous); Commonwealth v. LaCaprucia, 41 Mass. App. Ct. 496, 501-502 (1996) (prosecutor's remarks suggesting defendant sexually abused his children because he fit mold of abuser improper).[6]

The Commonwealth's effort to distinguish the challenged evidence from that held inadmissible in Day and its progeny is unavailing. At trial in this case, the Commonwealth attempted to prove that since the defendant did not match the physical characteristics of a drug addict, he must be a drug dealer. On appeal, the Commonwealth maintains that this use of profiling evidence was permissible because it did not explicitly compare the defendant to the profile of a drug dealer. Contrary to the Commonwealth's assertion, however, such so-called negative profiling evidence -- where the goal is to demonstrate that a person does not fit a particular profile -- falls squarely

---

[6] We note that the general bar against profiling evidence does not apply to instances where a medical expert testifies to the typical physical symptoms present in victims of a particular crime. See Commonwealth v. LeFave, 407 Mass. 927, 930-931 (1990) (pediatric gynecologist's testimony concerning physical damage to genitalia common in sexually abused children admissible). See also Commonwealth v. Dockham, 405 Mass. 618, 628-630 (1989) (expert testimony concerning general characteristics of abused child admissible).

within the scope of the profiling evidence we have long prohibited.

The rationale for this was explained recently in Coates, 89 Mass. App. Ct. at 735, where the Appeals Court concluded that a defendant's proffer of expert testimony showing that he did not match the profile of a sex abuser had been properly excluded at trial.[7] The Appeals Court cogently observed that "[i]mplicit in the defendant's assertion that he [did] not match a criminal profile is the assumption that such a profile would be probative if introduced to prove that someone who matched the profile would be more likely to have committed the crimes." Id. at 734. As the court noted, if the profile would be irrelevant to establish the defendant's guilt under Day, it also was irrelevant when introduced for any other purpose. Id. at 734-737. As the mirror image of the prototypical profiling evidence dealt with in Day, such negative profiling evidence serves the same impermissible end. It is an attempt to convince the jury to determine a defendant's guilt by comparing him or her to stereotypes rather than by individualized adjudication. Such evidence is inadmissible.

---

[7] In an unpublished memorandum and order, see Commonwealth v. Correa, 74 Mass. App. Ct. 1122 (2009), a panel of the Appeals Court concluded that the Commonwealth's use of expert testimony "about the stereotypical cocaine addict" in order to establish that the defendant was a drug dealer, as here, was inadmissible because it constituted improper "profiling testimony."

Given the well-established proscription against the use of profiling evidence, the admission of Feeney's testimony concerning the physical characteristics of crack cocaine addicts was error. Moreover, as we stated in Day, 409 Mass. at 723, the use of such evidence was "inherently prejudicial" to the defendant.

c. Materiality of the error. An "error creates a substantial risk of a miscarriage of justice unless we are persuaded that it did not 'materially influence[]' the guilty verdict" (citation omitted). Commonwealth v. Alphas, 430 Mass. 8, 13 (1999). In applying this standard, we analyze the potential impact of the error on the verdict, Commonwealth v. Randolph, 438 Mass. 290, 299 (2002), and review the record to determine the strength of the Commonwealth's case, absent the improper evidence, Commonwealth v. Kilburn, 438 Mass. 356, 362 (2003). An error may be said to have materially influenced the verdict only if we are left with "a serious doubt [as to] whether the result of the trial might have been different had the error not been made" (citation omitted). Commonwealth v. Azar, 435 Mass. 675, 687 (2002).

We may assume that Feeney's testimony was inherently prejudicial to the defendant. The impact of the testimony was magnified by the prosecutor's closing argument, in which the profiling testimony was presented as a key factor in

demonstrating that the defendant intended to distribute the cocaine. The first thing the jury heard as to why the defendant did not possess the cocaine for personal use but intended to distribute it was that his physical appearance showed that he was not a drug addict. The prosecutor stated, "How do you know he possessed [the cocaine] with the intent to distribute it, does he look like a drug addict?" The prosecutor then continued to emphasize the profiling evidence, contrasting the defendant's size, strength, and physical appearance, with the "drawn out" appearance of a typical "skinny" crack cocaine addict with "rotted teeth."

The deceptively intuitive appeal of this entreaty provided it with a "superficial plausibility . . . [that] masked its profound flaws." Commonwealth v. Ferreira, 460 Mass. 781, 788 (2011), quoting Commonwealth v. Ferreira, 77 Mass. App. Ct. 675, 685 n.6 (2010) (Milkey, J., dissenting). While the prosecutor went on to argue the impact of other items of evidence, the simplest and most direct evidence, from the standpoint of the jury, sat a few feet away from them at the defense table. We think it unlikely that the profiling evidence was only of minor significance to the jury.

The Commonwealth's remaining evidence, while clearly sufficient to support the conviction, was not overwhelming. As proof that the defendant possessed the crack cocaine with the

intent to distribute it, there was also evidence of (1) eighty-three dollars found in the central console of the vehicle that the defendant was driving; (2) three cellular telephones, two found in the central console of the vehicle and one found on the driver's seat; and (3) twenty-six individual packets of crack cocaine packaged in what Feeney testified could be ten- and twenty-dollar bags that had been found near the defendant's boot.  We consider each in turn.

While large amounts of cash can be probative of an intent to distribute, eighty-three dollars in cash would at best give rise to a weak inference.  See Commonwealth v. Sepheus, 468 Mass. 160, 166 (2014) (cash in amount of $312 not particularly large sum for purposes of demonstrating intent to distribute narcotics).  As to the cellular telephones, while a defendant's possession of multiple cellular telephones may be probative of an intent to distribute, see, e.g., Commonwealth v. Dancy, 75 Mass. App. Ct. 175, 178 (2009), it is far from clear whether all three cellular telephones found in the vehicle belonged to the defendant.  The defendant contended at trial that two of the cellular telephones, both of which were located in the central console of the automobile, belonged to others.  The vehicle that the defendant was driving, owned by Barton, had apparently recently been driven by Williams.  See note 2, supra.  The

Commonwealth did not present any evidence demonstrating that the defendant used the cellular telephones.[8]

The Commonwealth's strongest evidence concerns the crack cocaine found on the street and inferably belonging to the defendant. The drugs were packaged in twenty-six individual bags, which Feeney testified could have had a street value of ten to twenty dollars each. While the drugs packaged as they were could be probative of an intent to distribute, see, e.g., Commonwealth v. Martin, 48 Mass. App. Ct. 391, 392-393 (1999) (possession of 2.04 grams of cocaine in eighteen "dime" sized bags probative of intent to distribute), the weight of the cocaine, 3.87 grams, is also consistent with personal use. See, e.g., Commonwealth v. Roman, 414 Mass. 642, 646-647 (1993) (possession of 25.6 grams of cocaine, without more, not enough to prove distribution).

The Commonwealth's admissible evidence, taken as a whole, was certainly sufficient to support the defendant's conviction. See Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979) (sufficiency of evidence determined based on whether evidence in light most favorable to Commonwealth supports conviction). Nonetheless, the case against the defendant on the drug charge

---

[8] We also are mindful that the jury acquitted the defendant of the firearms-related charges despite the presence of a gun in the trunk of the vehicle that he was driving. This suggests that the jury did not accept the Commonwealth's argument that all of the items in the vehicle belonged to the defendant.

was not overwhelming. See Commonwealth v. Little, 453
Mass. 766, 775 (2009) (where prosecution's case not
overwhelming, error gave rise to substantial risk of miscarriage
of justice). Given this, along with the inherently prejudicial
impact of the error, magnified by the use of long-proscribed
profiling evidence in the Commonwealth's closing, we are left
with "a serious doubt [as to] whether the result of the trial
might have been different had the error not been made" (citation
omitted). Azar, 435 Mass. at 687. Accordingly, we conclude
that the error created a substantial risk of a miscarriage of
justice.

3. Conclusion. The judgment is vacated and set aside.
The matter is remanded to the Superior Court for further
proceedings consistent with this decision.

So ordered.