NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13338

COMMONWEALTH  vs.  NICHOLAS DESIDERIO.


Worcester.      February 8, 2023. – May 4, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt,
& Georges, JJ.


Armed Home Invasion.  Robbery.  Joint Enterprise.  Evidence,
    Joint venturer.  Practice, Criminal, Instructions to jury.



Indictments found and returned in the Superior Court
Department on March 3, 2015.

The cases were tried before Richard T. Tucker, J.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.


MarySita Miles for the defendant.
Nathaniel R. Beaudoin, Assistant District Attorney, for the
Commonwealth.


LOWY, J.  A jury in the Superior Court convicted the

defendant, Nicholas Desiderio, of one count of armed home

invasion and three counts of armed robbery while masked.  The

indictments were based on a theory of joint venture.  The jury,

however, were not instructed that, to convict the defendant of those charges on a joint venture theory, the Commonwealth was required to prove that the defendant knew that at least one coventurer was armed (for the count of armed home invasion), and that at least one coventurer was both armed and masked (for the counts of armed robbery while masked).  Those instructions were required.  See Commonwealth v. Bolling, 462 Mass. 440, 450 (2012).

The issue in this appeal is whether the failure to instruct the jury of these requirements created a substantial risk of a miscarriage of justice.  To decide whether an error creates a substantial risk of a miscarriage justice, we must determine "if we have a serious doubt whether the result of the trial might have been different had the error not been made."  Commonwealth v. Azar, 435 Mass. 675, 687 (2002), S.C., 444 Mass. 72 (2005), quoting Commonwealth v. LeFave, 430 Mass. 169, 174 (1999).  In making this determination, we consider four factors, where applicable:  "[(1)] the strength of the Commonwealth's case, [(2)] the nature of the error, [(3)] the significance of the error in the context of the trial, and [(4)] the possibility that the absence of an objection was the result of a reasonable tactical decision."  Azar, supra.

Although we recently have analyzed the question of substantial risk of a miscarriage of justice where an element of

a crime has been omitted from the jury instructions by determining whether "the evidence was 'so overwhelming' that 'there is no likelihood that the omitted instruction materially influenced the jury's verdict[],'" Commonwealth v. Silvelo, 486 Mass. 13, 17-18 (2020), quoting Commonwealth v. Lutskov, 480 Mass. 575, 581 (2018), we now recognize that this formulation confuses rather than accurately reflects the necessary considerations of the substantial risk analysis in this context.

As in all contexts, where an element of the crime charged has been omitted from the jury instructions, the factors for determining whether there was a substantial risk of a miscarriage of justice remain the focus of the analysis. The factors applicable to circumstances where an element has been omitted in particular, however, and the manner in which they should be considered, are captured in the standard we articulated in Azar: whether the presence of the omitted element was an ineluctable inference from the evidence at trial. See Azar, 435 Mass. at 687. This standard, although undoubtedly high, is best understood as an explanation of the applicable substantial risk factors, and not a deviation from their application. Where an element of a crime is omitted from the instructions, the jury are erroneously excused from applying the facts, as they find them, to that element. This creates a risk of conviction in circumstances where the Commonwealth failed to

meet its burden of proof beyond a reasonable doubt as to the missing element.  Our substantial risk of a miscarriage of justice analysis in these circumstances thus must be correspondingly exacting.

Because, in this case, the defendant's knowledge that the coventurers were armed or masked cannot be ineluctably inferred from the evidence at trial, the instructional error leaves us with a serious doubt whether the result of the trial might have been different had the jury been correctly instructed.  We therefore conclude that the error created a substantial risk of a miscarriage of justice.  As a result, we reduce the defendant's convictions of armed robbery while masked to unarmed robbery, and we vacate the judgment on the conviction of armed home invasion and set aside the verdict.

Background.  We recite the relevant facts adduced at trial to establish the defendant's guilt as a coventurer.

1.  The home invasion.  On the evening of January 5, 2014, the homeowner, his daughter, and her boyfriend, who was visiting for the evening, were all in the home.  The homeowner (victim)[1] went to bed at approximately 9 P.M., as he did most nights, after all the doors to his home were locked.  Not long after

---

[1] We recognize that the daughter and her boyfriend were also victims, but we refer to them by their relational titles to avoid confusion.

9 P.M., two masked men entered the home:  a shorter, heavy-set man with "Hispanic, African-American kind of complexion" and a tall, Caucasian man.[2]  The taller man carried a gun, and the shorter, heavier-set man carried a ten to twelve inch crowbar. It is undisputed that neither man was the defendant.

The two men first entered the daughter's bedroom, where the daughter and her boyfriend were watching television.  The men carried two zip ties.  They tied the boyfriend's hands behind his back with one of the zip ties, and then whispered to each other.  The daughter heard one say, "Just go duct tape her," and the men proceeded to tie the daughter's hands behind her back with duct tape.  The men also placed duct tape over the mouths of the daughter and her boyfriend.  The men forced both to lie on the floor and placed a blanket over their heads.  They asked the daughter where her father was, but they did not ask about her mother, who was deceased.

The men next went to the victim's bedroom.  The heavier-set man jostled the victim awake and flipped him over in bed.  He tied the victim's hands behind his back with the second zip tie. The men pulled the victim out of bed and pushed him down the hallway toward the living room where there was a stone chimney.

---

[2] The man with the darker complexion did not have his face fully covered by the mask, and while the lighter-complexioned man had a "full-fledged mask" on, the skin under his eyes was visible.

A picture that ordinarily hung on the chimney to hide a safe that was installed there had already been removed. The safe was exposed. At the taller gunman's insistence, the victim provided the men with the combination to unlock the safe. Unable to open the safe, the men freed the victim's hands so that he could input the combination. Once the safe was unlocked, the heavier-set man with the crowbar again bound the victim's hands, this time using duct tape. Meanwhile, the taller man filled a pillowcase with the safe's contents, which included $50,000 in cash in one hundred dollar bills, and numerous pieces of jewelry belonging to the victim, his daughters, and his deceased wife. The men also took "a couple hundred" dollars from the victim's wallet, as well as the victim's father's Purple Heart and other military medals from a chest inside the victim's bedroom.

After emptying the safe, the men led the victim to his daughter's bedroom, where the daughter and her boyfriend remained hand-bound on the floor. The men forced the victim to get on the floor, and they put the blanket over his head as well. The men asked if there was any more money or drugs in the house, and "ransack[ed]" the room, checking drawers and the mattress. They then left with the cell phones of all three. After hearing the men leave, the boyfriend slipped his right hand loose from the zip tie and freed the victim. The boyfriend next went to the window and saw the two men get into the front

and rear passenger seats of a waiting vehicle.  The vehicle was driven away, and the boyfriend found a telephone and dialed 911.  Police were dispatched to the house at 9:52 P.M.  When police arrived, no signs of forced entry were detected.

2.  Evidence connecting the defendant.  The defendant and the victim met around 2009, while the defendant was dating the daughter of the victim's cousin.  The defendant began to work for the victim's home construction business, and he did so for approximately three years until the victim scaled back his business in 2012 due to health issues.  During that time, the defendant was "like a family member" to the victim and often frequented the victim's home.  Indeed, the defendant became "very familiar" with the victim's home.  The defendant knew that the victim had a safe inside the stone chimney hidden behind a framed picture and that the victim kept large amounts of cash in this safe.  Further, the defendant knew that the victim's wife was deceased and that he lived with one of his daughters.

After the defendant had left the victim's employ, the victim's health improved, and he purchased a two-family house to remodel and sell.  The victim learned that the defendant was displeased with his living situation, and he offered to allow the defendant to live in the second-story apartment of the two-family house in exchange for the defendant's assistance with remodeling and maintenance.  The defendant agreed.  The

relationship, however, broke down in the summer of 2013 when the victim sold the house and informed the defendant that he needed to find another place to live. The defendant refused to leave and "threatened" the victim by stating, "If you weren't such an old, you know, SOB, I'd kick the shit out of you." The victim retained counsel and paid the defendant a sum of money, after which the defendant agreed to vacate the premises. The victim and the defendant had minimal contact following that dispute.

Around the time of the home invasion on January 5, 2014, the defendant and Timothy Lavin shared three telephone calls and one text message. At the time, the defendant and Lavin had known each other for twelve to thirteen years. There was considerable testimony at trial that Lavin matched the description of the tall, Caucasian gunman involved in the invasion. The first call was placed from Lavin's cell phone at 9:08 P.M. It connected to the defendant's cell phone at 9:09 P.M., and it lasted fifteen seconds on the defendant's cell phone.[3] The second call was placed at 9:15 P.M., and it lasted twenty-two seconds on the defendant's cell phone. At 9:33 P.M., Lavin sent a text message to the defendant that went unanswered. The third call was placed at 9:48 P.M., and it lasted seven

---

[3] There was some discrepancy between the length of the telephone calls registered to Lavin's and the defendant's cell phones due to the time it took to connect to the defendant's cell phone and for the defendant to answer.

seconds on the defendant's cell phone.  Each of the three calls connected to a cell tower that was less than one mile from the victim's home.

On January 22, just over two weeks after the home invasion, Lavin, who had a suspended license, was observed by police driving a BMW motor vehicle.[4]  Lavin was known to have an inconsistent work history and money issues, and investigation by police revealed that he had purchased the BMW six days earlier, on January 16, for $3,700 in cash.  The BMW was registered to Lavin's longtime friend, Gerald Bates.  Lavin was arrested that day for operating a motor vehicle with a suspended license, and his bail was set for an amount between $1,500 and $2,000.  Lavin paid most of his bail with a "bundle of hundred dollar bills" that he had on his person.  The defendant and his girlfriend drove to the police station, and his girlfriend went inside and paid the remaining amount while the defendant waited in the car.

Eight days later, police executed a search warrant at Lavin's residence.  Inside the residence, police discovered a mask, a firearm, and two locked safes.  One of the safes contained $2,700 in cash, and inside the other, multiple pieces of jewelry were found.  Among the jewelry recovered, the victim and his daughter identified the victim's high school class ring,

---

[4] Lavin stipulated at trial that his license was suspended on that date and that he had notice of the suspension.

the victim's wedding ring, the victim's deceased wife's watch and rings, and a necklace given to the daughter by her grandparents for graduating high school.

3. Procedural history. A grand jury indicted the defendant on one count of armed home invasion and three counts of armed robbery while masked.[5] The defendant's cases were joined with Lavin's for trial.[6] At trial, the Commonwealth proceeded against the defendant under a theory of joint venture, contending that the defendant provided the coventurers with the necessary information to execute the home invasion and robbery and that he acted as the getaway driver.

During the main jury charge, in accordance with Commonwealth v. Zanetti, 454 Mass. 449, 466 (2009), the judge instructed the jury that, to find the defendant guilty beyond a reasonable doubt of the crimes charged under a theory of joint venture, the Commonwealth was required to prove that the defendant knowingly participated in the commission of the offenses and shared or had the requisite intent for the offenses. However, the judge did not instruct the jury that, to prove that the defendant shared the intent required for those

_____

[5] The defendant also was indicted on one count of conspiracy, which was dismissed at the Commonwealth's request.

[6] The shorter, heavy-set man involved in the home invasion was never identified or charged.

crimes, the Commonwealth needed to prove that the defendant knew that at least one coventurer was armed, for the charge of armed home invasion, and that at least one coventurer was armed and masked, for the charges of armed robbery while masked. See Commonwealth v. Buth, 480 Mass. 113, 116, cert. denied, 139 S. Ct. 607 (2018) (under joint venture theory, "[w]here . . . an element of the offense is that the perpetrator is armed, the Commonwealth must prove that the defendant knew that at least one coventurer was armed"); Commonwealth v. Quinones, 78 Mass. App. Ct. 215, 219 (2010) ("To support a conviction on the charge of armed robbery while masked, the Commonwealth, proceeding on a joint venture theory of the defendant's guilt, had the burden of proving that the defendant knew that the principal perpetrators of the robbery . . . would be both armed and masked"). The defendant did not object to the jury instructions. The jury convicted him of all four counts.

The defendant appealed. The Appeals Court, in a divided opinion, concluded that the failure to instruct the jury that the Commonwealth was required to prove that the defendant knew that his coventurers were armed and masked created a substantial risk of a miscarriage of justice because, pursuant to the standard we articulated in Silvelo, 486 Mass. at 18, "the evidence . . . was not 'so overwhelming' that 'there is no likelihood that the omitted instruction materially influenced

the jury's verdict[].'"[7] Commonwealth v. Lavin, 101 Mass. App. Ct. 278, 279 (2022). We allowed the Commonwealth's application for further appellate review, limited to the issue whether the failure to instruct the jury on the Commonwealth's burden to prove that the defendant knew that one of the coventurers was armed and masked created a substantial risk of a miscarriage of justice.

Discussion. 1. Standard of review. Because the defendant did not object to the erroneous jury instructions, we review the case to determine whether the instructional error created a substantial risk of a miscarriage of justice. See Bolling, 462 Mass. at 452. "The substantial risk standard requires us to determine 'if we have a serious doubt whether the result of the trial might have been different had the error not been made.'" Azar, 435 Mass. at 687, quoting LeFave, 430 Mass. at 174. In conducting this analysis, we are guided by four factors: "[w]e consider [(1)] the strength of the Commonwealth's case, [(2)] the nature of the error, [(3)] the significance of the error in the context of the trial, and [(4)] the possibility that the

---

[7] The Appeals Court, at the Commonwealth's request, reduced the defendant's convictions of armed robbery while masked to unarmed robbery and remanded for resentencing of those charges, but vacated the defendant's conviction of armed home invasion, leaving to the Commonwealth the decision whether to retry the defendant on that charge. See Commonwealth v. Lavin, 101 Mass. App. Ct. 278, 301 (2022).

absence of an objection was the result of a reasonable tactical decision."  Azar, supra.  See Commonwealth v. Alphas, 430 Mass. 8, 13 (1999) (setting forth factors applicable to standard of review for unpreserved errors in noncapital cases).  See also Commonwealth v. Randolph, 438 Mass. 290, 298 (2002) (articulating formulation as series of questions).

We previously have addressed the particular suitability of the substantial risk of a miscarriage of justice standard to situations where the elements of a crime are stated erroneously or are omitted from the jury instructions.  See Silvelo, 486 Mass. at 17 n.7, quoting Azar, 435 Mass. at 687.  In Azar, where the judge provided an erroneous definition of the "so-called third prong of malice" in a murder trial, which lowered the Commonwealth's burden of proof, we surveyed cases where the same error had or had not required reversal.  See Azar, supra at 682, 687-688, and cases cited.  We deduced from those cases that a new trial is not required where the evidence at trial did not permit a finding of lesser proof than what is required under the third prong of malice -- the erroneously stated element.  Id. at 687-688.  We therefore stated that the proper question in such circumstances is "whether the evidence required the jurors to find [the omitted or erroneously stated element, had it been correctly stated]."  Id. at 688.  In other words, where the presence of the omitted or erroneously stated element, "as it is

correctly understood, can be 'ineluctably inferred' from the evidence," a new trial is not necessary. Id., quoting Commonwealth v. Vizcarrondo, 427 Mass. 392, 397 (1998), S.C., 431 Mass. 360 (2000).

More recently, in Silvelo, 486 Mass. at 17, where the judge omitted from the jury instructions an essential element of the crime of possession of a loaded firearm, and the defendant failed to object, we similarly applied the substantial risk of a miscarriage of justice standard. There, we stated that our consideration in this context was "to determine whether the evidence was 'so overwhelming' that 'there is no likelihood that the omitted instruction materially influenced the jury's verdict[].'" Id. at 17-18, quoting Lutskov, 480 Mass. at 581. In so stating, we specifically acknowledged that "this formulation diverge[d] from Azar, 435 Mass. at 688, under which we analyzed whether the 'evidence required the jury to [have found]' or to have 'ineluctably inferred' that the Commonwealth carried its burden of proving the omitted element beyond a reasonable doubt." Silvelo, supra at 18 n.9. We nevertheless emphasized that, in using this particular formulation, we did not "intend this semantic difference in language to change the stringency of the standard announced in Azar." Id. We meant it.

The reason the substantial risk of a miscarriage of justice standard is stringent in this context is not because we apply a different test to this type of error from the one we apply to others.  In all noncapital cases,[8] where a defendant has waived a claim of error, our review is limited to the substantial risk of a miscarriage of justice standard, which "calls for us to decide if we have a serious doubt whether the result of the trial might have been different had the error not been made."[9]  LeFave, 430 Mass. at 174-175 & n.6.  However, in making this determination, we must consider the relevant factors applicable to the substantial risk analysis, including the nature of the error and its significance in the context of the evidence presented at trial.  See Alphas, 430 Mass. at 13.  Omitting an element from the jury instructions is an error of constitutional dimension, see Neder v. United States, 527 U.S. 1, 12-14 (1999), that poses a significant risk that the jury will convict the defendant on

---

[8] In capital cases, we review claims of unpreserved error for a substantial likelihood of a miscarriage of justice. Commonwealth v. Duke, 489 Mass. 649, 659 (2022).

[9] We also have said that "[a]n error creates a substantial risk of a miscarriage of justice unless we are persuaded that it did not 'materially influence[]' the guilty verdict."  Alphas, 430 Mass. at 13, quoting Commonwealth v. Freeman, 352 Mass. 556, 564 (1967).  The two explanations produce the same result:  "An error may be said to have materially influenced the verdict only if we are left with 'a serious doubt [as to] whether the result of the trial might have been different had the error not been made'" (citation omitted).  Commonwealth v. Horne, 476 Mass. 222, 228 (2017).

proof less than what is required for the crime charged.  See Azar, 435 Mass. at 688-689.  And on appeal, "our role is not to sit as a second jury."  Id. at 689.  Thus, in order for us not to have serious doubt that the defendant's guilt has been fairly adjudicated, such that the error did not create a substantial risk of miscarriage of justice, we must analyze the evidence pertaining to that element with an exacting lens.  See id. at 687-688.

This substantial risk analysis contemplates whether the evidence addressing the omitted or erroneously stated element was overwhelming or uncontested at trial.  Compare Lutskov, 480 Mass. at 581 (omitted instruction on Commonwealth's burden to prove defendant's age created no substantial risk of miscarriage of justice where evidence of age was "so overwhelming that [it] was not a contested issue at trial"), with Bolling, 462 Mass. at 450-452 (omitted instruction on Commonwealth's burden to prove defendant knew coventurer was armed created substantial risk of miscarriage of justice where evidence of defendant's knowledge that one coventurer was armed "was not overwhelming" and was contested at trial).  Cf. Johnson v. United States, 520 U.S. 461, 470 (1997) (unpreserved error of omitted instruction on materiality in perjury prosecution created no "miscarriage of justice" where "evidence supporting materiality was

'overwhelming,'" and "[m]ateriality was essentially
uncontroverted at trial" [citation omitted]).

Thus, in providing another articulation of how we analyze
substantial risk of a miscarriage of justice in the omitted
element context in Silvelo, 486 Mass. at 17-18, we asked
"whether the evidence was 'so overwhelming' that 'there is no
likelihood that the omitted instruction materially influenced
the jury's verdict[]'" (citation omitted).  We now acknowledge
that this articulation of the standard is flawed.  It is so, in
part, because it mirrors our prior explanation of the standard
for analyzing harmless error -- the standard applicable to
preserved constitutional error.  See Commonwealth v. Castano,
478 Mass. 75, 82 (2017), quoting Commonwealth v. Dagraca, 447
Mass. 546, 555 (2006) ("an error may be harmless beyond a
reasonable doubt where the Commonwealth's evidence is so
'overwhelming' that it 'nullif[ies] any effect the erroneously
admitted [evidence] might have had on the jury or the
verdict'").  But more so, this formulation poses a question
that, in most cases, is extremely difficult to answer:  whether,
because the evidence was "so overwhelming," there is no
likelihood, theoretical or otherwise, that the error materially
influenced the verdict.  Silvelo, supra.

Our review of unpreserved errors is not whether there is
any risk of a miscarriage of justice, but rather, it is whether

that risk is a substantial one.  See Azar, 435 Mass. at 676, quoting LeFave, 430 Mass. at 175 ("society's justified interest in finality . . . has long been implicit, and sometimes explicit, in our announcements that any late-arriving issue will prevail only if the issue presents a substantial risk of a miscarriage of justice").  See also Commonwealth v. Russell, 439 Mass. 340, 351 (2003) ("As the terminology implies, a 'substantial risk of a miscarriage of justice' refers to a risk that has some genuine substance to it.  That standard does not encompass an abstract, theoretical possibility of a miscarriage of justice, utterly divorced from the case as it was tried. . . .  [If] the only risk identified is one that is totally removed from or at odds with that 'context,' we may rest assured that the error did not give rise to a substantial risk of a miscarriage of justice").

To be sure, whether the Commonwealth's evidence is "overwhelming," let alone "so overwhelming," is certainly a consideration in the substantial risk calculus as a general matter.  It is, however, one part of that analysis.  See Alphas, 430 Mass. at 13.  The analysis of substantial risk of a miscarriage of justice must consider the four factors as they apply to the individual circumstances of each case.  But not all of the factors will be applicable in every case, and the way that they apply may vary depending on the particular

circumstances.  Where the nature of the error is omitting an element from the jury instructions, specifically, our assessment of the strength of the Commonwealth's evidence must focus on the evidence addressing the element that was stated erroneously or omitted from the jury instructions.

In this case, notably, the Commonwealth does not argue that the fourth factor -- whether it can be inferred that the defendant's failure to object to the erroneous jury instructions was a reasonable tactical decision -- is applicable.  See Alphas, 430 Mass. at 13.  Nor can we now contemplate a case where the failure to object to jury instructions relieving the Commonwealth of its burden to prove a necessary element beyond a reasonable doubt would be the result of a reasonable tactical decision.[10]  See Bolling, 462 Mass. at 452 ("it seems unlikely that the failure to request the instruction was a reasonable

_____

[10] We note that the circumstances here are distinguishable from those where a defendant strategically declines to request an instruction on the elements of a lesser included offense. See, e.g., Commonwealth v. Glover, 459 Mass. 836, 844 (2011) (reasonable strategic decision not to request instruction on voluntary manslaughter so as to proceed solely on theory of self-defense).  But see id. at 843 n.8 ("However, where defense counsel's strategic decision not to request an instruction on a lesser included offense . . . is manifestly unreasonable, a judge may need to exercise the inherent authority to give the instruction sua sponte to protect the case from the risk of reversal on appeal").  We also note that a judge may always provide an instruction on a lesser included offense that is warranted from the evidence, regardless of whether the defendant or the Commonwealth objects.  See Commonwealth v. Russell, 470 Mass. 464, 480 (2015).

tactical decision because requiring the jury to make an additional finding about the defendant's state of mind before convicting him could not have prejudiced his case"); Azar, 435 Mass. at 689 ("there is no reasonable tactical basis for a failure to object to a mistaken and unfavorable [to the defendant] definition of an element of the crime").

Accordingly, where an element that the Commonwealth is required to prove beyond a reasonable doubt is omitted from the jury instructions, our analysis of substantial risk of a miscarriage of justice is limited to considering the three remaining factors, which focus on the strength of the Commonwealth's evidence in light of the nature of the error and its significance in the context of the trial. These factors are all captured by the standard articulated in Azar, 435 Mass. at 688. We therefore clarify today that, to determine whether a substantial risk of a miscarriage of justice is created by the omission of a required element from the jury instructions, the question is, as we said in Azar, supra, whether the presence of the omitted element was an ineluctable, or inescapable, inference from the evidence presented at trial. In light of the nature and significance of this type of error, only when the answer to that question is "yes," in this context, will the error not create a substantial risk of a miscarriage of justice. In other contexts, of course, the substantial risk determination

will depend on the circumstances of each case, considering the applicable factors.  See Alphas, 430 Mass. at 13.

2.  Application.  To prove beyond a reasonable doubt that the defendant was guilty of armed home invasion and armed robbery while masked under a theory of joint venture, the Commonwealth was respectively required to prove that the defendant knew that one coventurer was armed, and that one coventurer was both armed and masked.  We therefore must determine whether the presence of these elements was an ineluctable inference from the evidence at trial.[11]  Because, as to either element, we conclude it was not, we are left with a serious doubt whether the result of the trial might have been different had the instructional error not been made.

There was no direct evidence that the defendant knew that the coventurers were armed or masked.  This is "not determinative," however, because a defendant's knowledge that a coventurer is armed or masked may be proved by circumstantial

---

[11] The Commonwealth's argument that this standard should not apply in this case because the requirements of joint venture are not elements of the underlying crimes is unavailing.  While "joint venture is neither a crime nor an element of a crime," Commonwealth v. Fluellen, 456 Mass. 517, 522 (2010), the perpetrator being armed is an element of both underlying crimes in this case.  See G. L. c. 265, §§ 17, 18C.  Thus, to convict the defendant of those crimes under a joint venture theory, the Commonwealth needed to prove that the defendant knew that one coventurer was armed.  See Buth, 480 Mass. at 116.  The same is true of the preparator being masked for the charge of armed robbery while masked.  See Quinones, 78 Mass. App. Ct. at 219.

evidence.  See Commonwealth v. Ellis, 432 Mass. 746, 762 (2000).
The Commonwealth directs our attention to nine pieces of
circumstantial evidence that it asserts should leave us with no
serious doubt that the defendant's guilt as a coventurer was
fairly adjudicated.

This circumstantial evidence includes (1) evidence
suggesting that the defendant told the coventurers intimate
details about the victim's home, such as the location of the
safe, indicated by the removal of the picture from the chimney;
(2) evidence suggesting that the defendant knew and told the
coventurers that the victim kept large amounts of cash in the
safe; (3) evidence suggesting that the defendant told the
coventurers that only two people would be in the home, such as
them having brought only two zip ties; (4) evidence suggesting
that the defendant told the coventurers that the victim's wife
was deceased, such as the coventurers not asking the daughter
where her mother was; (5) evidence that the defendant had a
motive to seek revenge and steal money from the victim due to
their animosity arising out of the defendant's living
arrangement in the summer of 2013; (6) evidence that the
defendant and Lavin communicated via cell phone on the night of
the home invasion; (7) historical cell site location information
(CSLI) evidence placing the defendant in the vicinity of the
home invasion at the time it occurred; (8) evidence that the

defendant and his girlfriend drove to the police station to pay Lavin's bail, but the defendant stayed in the car, inferably to avoid police connecting him with Lavin; and (9) evidence that the defendant and Lavin had a close relationship.

There is no question that the coalescence of this circumstantial evidence told a powerful and persuasive story that the defendant was substantially involved in the home invasion and subsequent robbery.  It did not, however, require the jury to find that the defendant knew that his coventurers were armed and masked during the commission of those crimes. See Azar, 435 Mass. at 688.  While the evidence suggesting that the defendant assisted with orchestrating the crimes and acted as the getaway driver may have been sufficient for the jury to infer that the defendant possessed the requisite knowledge, see Commonwealth v. Netto, 438 Mass. 686, 703 (2003), such inferences were hardly ineluctable.[12]

At trial, there was no evidence -- direct or circumstantial -- that one of the coventurers conspicuously possessed a weapon or a mask around the defendant.  The most forceful evidence that the defendant knew that the coventurers were armed and masked was the evidence that placed him in the vicinity of the home on

---

[12] For sufficiency purposes, "[i]nferences must be reasonable, but they do not have to be inescapable."  Netto, 438 Mass. at 703.  The same is not true of our calculus here.

the night in question and suggested that he drove the getaway vehicle.  However, as the Commonwealth has acknowledged, to adjudicate the defendant guilty as a coventurer, the jury were not required to find that the defendant participated in the crimes by driving the getaway vehicle.  Given the other evidence of his participation, and the defendant's vehement challenges to the accuracy of the CSLI evidence placing him near the victim's home that night,[13] it is not readily apparent that the jury did so find.  Even if the jury did find that the defendant was the getaway driver, although it would have been permissible for them to infer the defendant's knowledge from this fact, see Commonwealth v. Cannon, 449 Mass. 462, 470-471 (2007), the absence of evidence that the coventurers exhibited weapons or masks when leaving or entering the vehicle could also have led the jury to reach the opposite inference.

In short, while the evidence that the defendant knew that the coventurers were armed and masked during the home invasion

---

[13] Specifically, on cross-examination of the State police trooper who testified for the Commonwealth about the defendant's CSLI, the defendant elicited testimony that historical CSLI such as that used in this case is the least accurate method to identify the location of a cell phone.  The trooper further testified on cross-examination that a cell site tower may have a range of five or more miles, and that cell phones do not always connect to the cell tower to which they are physically closest.  In closing, the defendant relied heavily on this testimony to undermine the Commonwealth's position that the defendant's CSLI placed him in the vicinity of the victim's home at the time of the crimes.

and robbery was certainly sufficient, and from that evidence the jury were more than entitled to draw those inferences, we cannot say that the inferences were ineluctable.  Without proper instruction informing the jury that the Commonwealth was required to prove the defendant's knowledge of those two particulars beyond a reasonable doubt, we are left with a serious doubt whether the outcome of the trial would have been different had the instructional error not been made.  The error therefore created a substantial risk of a miscarriage of justice.

Conclusion.  Consistent with the Commonwealth's request in the Appeals Court, the defendant's convictions of armed robbery while masked are reduced to unarmed robbery, and the matter is remanded to the Superior Court for resentencing of those offenses.  The judgment on the defendant's conviction of armed home invasion is vacated and the verdict is set aside.

So ordered.