LAVIN, COMMONWEALTH vs., 101 Mass. App. Ct. 278

 
 COMMONWEALTH vs. TIMOTHY M. LAVIN (and ten companion cases [Note 1]).

101 Mass. App. Ct. 278
 March 5, 2020 - June 23, 2022

Court Below: Superior Court, Worcester County
Present: Meade, Rubin, Wolohojian, Sacks, & Ditkoff, JJ. [Note 2]

 

Nos. 18-P-1652 & 18-P-1653.

Armed Home Invasion. Robbery. Firearms. Evidence, Joint venturer, Expert opinion. Jury and Jurors. Cellular Telephone. Search and Seizure, Warrant, Affidavit. Witness, Expert. Practice, Criminal, Required finding, Instructions to jury, Jury and jurors, Warrant, Affidavit.

At the trial of indictments charging two codefendants with, inter alia, armed home invasion and armed robbery while masked, a substantial risk of a miscarriage of justice arose from the failure by the trial judge to instruct the jury that the Commonwealth was required to prove that the defendant who was alleged to have been the driver of the getaway car knew that his coventurers were armed and masked, in that the evidence against the defendant, although sufficient (i.e., the defendant aided and abetted two intruders, including the codefendant, by helping them plan the robbery and acting as the getaway driver and had a motive to rob the victim), was not so overwhelming that there was no likelihood that the omitted instruction materially influenced the jury's verdict, in that there was no direct evidence of the defendant's knowledge and (with one exception) all of the inferences of his knowledge rested on the inference, which was not inescapable or necessarily found by the jury, that the defendant saw the weapons and masks as the driver of the car in which the two intruders rode to and from the victims' home; in that, given that the defendant contested his presence as the driver and thereby implicitly contested his knowledge of the weapons and masks, the omitted elements related to an actively contested issue; and in that counsel's failure to request instructions on the knowledge elements was far more likely to have been an oversight than a tactical choice. [282-293] Ditkoff, J., dissenting, with whom Meade, J., joined.

A Superior Court judge did not abuse his discretion in denying, without holding an evidentiary hearing, a criminal defendant's motion for a new trial on the ground that a juror failed to disclose his familiarity with a witness, where, 

 Page 279 

even had the motion judge credited the assertions of the witness that he knew and recognized the juror, there was no indication that the juror recognized the witness or that there was any relationship more than just mere acquaintance. [293-295]

At a criminal trial, the judge neither erred nor abused his discretion in admitting a State police trooper's testimony about cell site location information evidence, at least as the trooper qualified it. [295-297]

A Superior Court judge properly denied the criminal defendants' various motions to suppress evidence obtained from searches conducted pursuant to search warrants of one defendant's home and for both defendants' cell site location information data. [297-301]

Indictments found and returned in the Superior Court Department on March 20, 2014, and March 3, 2015.

 Pretrial motions to suppress evidence were heard by Richard T. Tucker, J.; the cases were tried before him; and a motion for a new trial was considered by Michael K. Callan, J.

 Justin Drechsler for Timothy M. Lavin.

 MarySita Miles for Nicholas Desiderio.

 Nathaniel R. Beaudoin, Assistant District Attorney, for the Commonwealth.

 SACKS, J. The defendants, Timothy M. Lavin and Nicholas Desiderio, appeal from convictions, after a Superior Court jury trial, of armed home invasion, G. L. c. 265, § 18C; and three counts each of armed and masked robbery, G. L. c. 265, § 17. Lavin also appeals from convictions of unlawfully carrying a firearm, G. L. c. 269, § 10 (a), as an armed career criminal, G. L. c. 269, § 10G (c); unlawful possession of ammunition, G. L. c. 269, § 10 (h) (1), as an armed career criminal; and operating a motor vehicle after a suspension, G. L. c. 90, § 23, and from the order denying the defendants' motion for a new trial. The trial judge failed to instruct the jury that the Commonwealth had to prove that Desiderio, the alleged driver of the getaway car, knew that his coventurers were armed and masked. Applying the Supreme Judicial Court's decision in Commonwealth v. Silvelo, 486 Mass. 13 (2020), we conclude that this omission created a substantial risk of a miscarriage of justice, because the evidence against Desiderio, although sufficient, was not " 'so overwhelming' that 'there is no likelihood that the omitted instruction materially influenced the jury's verdict[ ].' " Id. at 18, quoting Commonwealth v. Lutskov, 480 Mass. 575, 581 (2018).

 We further conclude that the judge who considered the defendants' motion for a new trial (this was a judge other than the trial judge) did not err in denying that motion, which sought inquiry of 

 Page 280 

a juror, where a witness friendly to Lavin stated after trial that one of the jurors was an umpire in a softball league in which the witness and Lavin had played. We also conclude that the trial judge acted within his discretion in admitting a State trooper's testimony about cell site location information (CSLI) evidence, at least as the trooper qualified it. Finally, we conclude that the trial judge properly denied the defendants' various motions to suppress evidence obtained from searches conducted pursuant to search warrants of Lavin's home and for both defendants' CSLI data. We affirm Lavin's convictions. As to Desiderio, because of the instructional error, we vacate the judgment of conviction of home invasion and set aside the verdict; we reduce his three convictions of armed robbery to unarmed robbery and remand for resentencing on those convictions.

 Background. The primary victim (victim) met Desiderio, who was romantically involved with the victim's first cousin's daughter, sometime in 2009 or earlier. The victim hired Desiderio to work for him in the home repair business, which Desiderio did for three years with great success. In 2012, Desiderio left for another job in the same field. Because of the family relationship, Desiderio "was like a family member." He frequently came to the victim's house, and he assisted the victim in installing a safe hidden behind a picture in that house.

 Around the time that Desiderio left the victim's employ, the victim purchased a second house in Leicester. At the victim's suggestion, Desiderio and the victim's cousin lived in the house in exchange for Desiderio's assistance in remodeling it. In summer 2013, the victim sold the remodeled house and asked Desiderio to leave. Desiderio refused to leave and, indeed, came to the victim's home and said, "If you weren't such an old, you know, SOB, I'd kick the shit out of you." After the victim retained counsel, Desiderio eventually agreed to leave. He expressed to his new boss that he felt that the victim had shortchanged him.

 On January 5, 2014, at some point after 9 p.m., two men wearing black face masks entered the victim's home. The men entered the victim's daughter's bedroom, one carrying a handgun, and the other carrying a ten- to twelve-inch crowbar, zip ties, and duct tape. [Note 3] They tied the daughter's boyfriend's hands with a zip tie 

 Page 281 

and gagged him with duct tape. They had only two zip ties, [Note 4] so they whispered to each other and then one said, "Just go duct tape her." Then they duct taped the daughter's wrists and mouth.

 The men asked the daughter where her father was and left for his bedroom before she could answer. They did not ask where her mother was, suggesting that they were aware that her mother would not be in the house.

 The intruders woke the victim and tied his wrists with a zip tie. They brought him to the safe. They had already removed the picture hiding it. The intruders forced the victim to open the safe and took $50,000 in cash and a significant amount of jewelry.

 The men deposited the victim with his daughter and asked whether there was any more money or if there were any drugs in the house. Then they searched through some drawers and the mattresses. Before leaving the premises, the masked men took the residents' and boyfriend's cell phones with them. As they left, the gunman smacked the daughter on the buttocks and said, "Thanks for being a good sport." [Note 5]

 The boyfriend freed himself and saw the two men run from the house to a waiting motor vehicle. The two men got into the front and rear passenger's seats of the vehicle, and then the vehicle drove away. The boyfriend called the police at 9:52 p.m.

 On the night of the home invasion, there were three cell phone calls from Lavin to Desiderio between 9:09 p.m. and 9:48 p.m. and a text message from Lavin to Desiderio around 9:33 p.m. All three calls were handled, both for Lavin and Desiderio, by the same cell phone tower, which was less than one mile from the victim's home.

 Lavin had problems with drug use and was generally short of money. Nonetheless, in mid-January 2014, he bought an expensive gaming system for his son. On January 16, 2014, Lavin purchased a used BMW motor vehicle for $3,700 in cash. He registered the vehicle to Gerald Bates, a longtime friend. [Note 6] Bates had known Lavin for twenty years.

 Page 282 

 On January 22, 2014, Lavin was arrested for operating the BMW with a suspended license. Lavin admitted to driving with a suspended license. [Note 7] Desiderio drove his girlfriend to the police station, where she provided cash to bail out Lavin. Desiderio later admitted that he had paid the bail. Desiderio admitted to knowing Lavin for twelve to thirteen years prior to 2014.

 On January 30, 2014, police officers searched Lavin's home pursuant to a search warrant. They found a mask in Lavin's closet. They discovered jewelry, coins, and a large amount of cash in Lavin's safes. The victim and the daughter identified the victim's high school graduation ring, his wedding ring, his late wife's watch and rings, and various other pieces of jewelry belonging to the family among the items retrieved from the safes. The police also found a handgun in a bag in Lavin's basement. The victim's father's World War II medals were never recovered.

 The defendants were tried together, and both defendants were convicted of armed home invasion and three counts each of armed and masked robbery. Lavin was also convicted of operating a motor vehicle with a suspended license, unlawfully carrying a firearm, and unlawful possession of ammunition. Lavin then pleaded guilty to the armed career criminal enhancements. These appeals followed. The defendants also appeal from the order, by a judge other than the trial judge, denying their joint motion for a new trial, which was based on a claim of juror bias.

 Discussion. 1. Sufficiency of the evidence of Desiderio's guilt. In reviewing the sufficiency of the evidence, "we consider the evidence introduced at trial in the light most favorable to the Commonwealth, and determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Commonwealth v. Faherty, 93 Mass. App. Ct. 129, 133 (2018), quoting Commonwealth v. Oberle, 476 Mass. 539, 547 (2017). "The inferences that support a conviction need only be reasonable and possible; [they] need not be necessary or inescapable" (quotation and citation omitted). Commonwealth v. Waller, 90 Mass. App. Ct. 295, 303 (2016). "To support a conviction on the charge of armed robbery while masked, the Commonwealth, proceeding on a joint venture theory of the defendant's guilt, had the burden of proving that the defendant knew that the principal perpetrators of the robbery ... would be 

 Page 283 

both armed and masked." Commonwealth v. Quinones, 78 Mass. App. Ct. 215, 219 (2010).

 There was sufficient evidence that Desiderio aided and abetted the two intruders by helping them plan the robbery and by acting as the getaway driver. The two masked men had considerable inside information about the victim's house. They located the hidden safe without having to ask the victim about it. They asked the daughter about her father, but not her mother, suggesting they knew that the mother was not in the house. They had brought two zip ties, evidencing that they expected two residents to be present. They seemed surprised by the unexpected presence of the daughter's boyfriend, forcing them to use duct tape for the daughter's wrists. All of this information reflected knowledge that Desiderio had obtained or inferably obtained through his relationship with the victim's family and his assistance in installing the safe. See Commonwealth v. Palmer, 59 Mass. App. Ct. 415, 421 (2003) ("familiarity with the layout and operation of the store which was likely provided by insiders" contributed to sufficiency of evidence that defendant, whose friends worked at store, was involved in armed robbery).

 Furthermore, Desiderio had a motive to rob the victim. The victim had evicted Desiderio from the home Desiderio had helped remodel, which Desiderio felt was in violation of their agreement. Desiderio had expressed his view that he had been treated unfairly, and he had threatened the victim. See Commonwealth v. Fredette, 97 Mass. App. Ct. 206, 210, 214-215 (2020) (motive evidence contributed to sufficiency).

 By Desiderio's own admission, he had known Lavin for years and indeed paid his bail. Lavin called Desiderio three times and sent him a text message during the robbery. [Note 8] The CSLI placed Desiderio in the vicinity of the robbery while it was happening. See Commonwealth v. Barbosa, 477 Mass. 658, 667 (2017) (global positioning system data placing defendant at scene contributed to sufficiency). From the boyfriend's observations of the intruders getting into the passenger's seats of the getaway vehicle, the jury could infer that it was driven by a third person who waited in it during the robbery. See Commonwealth v. Roman, 

 Page 284 

 74 Mass. App. Ct. 251, 254-255 (2009). From the cell phone data and motive evidence, the jury could infer that the driver was Desiderio. Contrast Commonwealth v. Morris, 422 Mass. 254, 257-258 (1996) (evidence insufficient without proof defendant was present at scene of crime during time of crime).

 There was also sufficient evidence that Desiderio knew that at least one of coventurers was armed and masked. See Commonwealth v. Buth, 480 Mass. 113, 116, cert. denied, 139 S. Ct. 607 (2018); Commonwealth v. Gorman, 84 Mass. App. Ct. 482, 489 (2013). "Knowledge that a fellow joint venturer is armed may be inferred when, from the circumstances of the crime, a victim's resistance is reasonably to be anticipated such that the participants in the crime would have recognized the need for some means by which to overcome that resistance." Commonwealth v. Netto, 438 Mass. 686, 702-703 (2003).

 The evidence demonstrated that the intruders expected to encounter two residents and to have to gag and handcuff them. The robbery involved opening a safe and took approximately thirty minutes to complete. In short, this was not the sort of robbery that was likely to succeed without the use of weapons and masks. See Palmer, 59 Mass. App. Ct. at 426 ("The crime was an elaborate venture requiring detailed planning and was unlikely to be accomplished successfully without weapons and masks"). Accordingly, there was sufficient evidence of Desiderio's knowledge that his coventurers were armed and masked. See Quinones, 78 Mass. App. Ct. at 219, quoting Commonwealth v. Leach, 73 Mass. App. Ct. 758, 763 (2009) ("The jury may infer the requisite mental state from the defendant's knowledge of the attendant circumstances and his subsequent participation in the offense").

 2. Jury instructions on knowledge of armed and masked. "To support a conviction on the charge of armed robbery while masked, the Commonwealth, proceeding on a joint venture theory of the defendant's guilt, ha[s] the burden of proving that the defendant knew that the principal perpetrators of the robbery ... would be both armed and masked." Quinones, 78 Mass. App. Ct. at 219. The same knowledge requirement applies where a defendant is prosecuted on a joint venture theory for a crime for which being armed is an element: the defendant must know that the principal perpetrator was armed. See Commonwealth v. Bolling, 462 Mass. 440, 450 (2012). The jury must be instructed on the need to find the defendant's knowledge. See id. Here, the judge failed to instruct the jury that, to convict Desiderio on a 

 Page 285 

joint venture theory, they must find these knowledge elements. Desiderio did not object at the time; he raises the issue for the first time on appeal. [Note 9] Consequently, we review the claim to determine whether any error created a substantial risk of a miscarriage of justice.

 As the Supreme Judicial Court has held, when the jury are not instructed on an element of the crime, the omission creates a substantial risk of a miscarriage of justice unless the evidence is " 'so overwhelming' that 'there is no likelihood that the omitted instruction materially influenced the jury's verdict[ ]' " (citation omitted). Silvelo, 486 Mass. at 18. Because the evidence of Desiderio's knowledge does not meet that standard, we conclude that the instructional omission here created a substantial risk of a miscarriage of justice.

 a. Omitted elements. "An element is a fact that must be proved by the prosecution in order to sustain a conviction, that is, a fact of which the Commonwealth has both the burden of producing some evidence and the burden of persuading the trier of fact beyond a reasonable doubt." Commonwealth v. Burke, 390 Mass. 480, 483 (1983). Under well-settled law, Desiderio's knowledge of the weapons and of the masks were elements of the crimes under the Commonwealth's joint venture theory. See, e.g., Commonwealth v. Claudio, 418 Mass. 103, 111-113 (1994) ("essential element" of crime for which being armed is element, when prosecuted on joint venture theory, is "the critical knowledge element," i.e., "that the defendant actually knew that one of his [coventurers] was armed"); Gorman, 84 Mass. App. Ct. at 490 (joint venture case where instructions "did not adequately inform the jury of the element of each offense that the defendant have knowledge of the gun"); id. at 491 (jury should have been instructed "that they were required to find, as an element of each of the offenses for which he was convicted, that the defendant knew of the gun"). See also Commonwealth v. Johnson, 92 Mass. App. Ct. 538, 544 (2017) (citing Gorman, supra at 489, for this requirement); Commonwealth v. Colon, 52 Mass. App. Ct. 725, 731 (2001) ("failure to instruct the jury that they were required to find an essential element of the crime, namely that the defendant knew the perpetrator was armed, in order to convict the defendant of armed robbery on a joint venture basis resulted in a substantial risk of a miscarriage of justice," in circumstances presented).

 Page 286 

 "In the absence of proof that the defendant himself was armed with a dangerous weapon, proof that the defendant knew that [his coventurer] was so armed would satisfy the first element of armed robbery." Commonwealth v. Williams, 475 Mass. 705, 710 (2016). See Commonwealth v. Britt, 465 Mass. 87, 99 (2013) (referring to such knowledge as "an element of the Commonwealth's proof"); Commonwealth v. Melendez, 427 Mass. 214, 215-216 (1998) (referring to "omission of th[is] knowledge element in instructing on" joint venture liability for crime involving use of dangerous weapon).

 These cases may be viewed as applications of the rule that one of joint venture liability's "two essential elements" is "that the defendant knowingly participated in the commission of the crime charged" (emphasis added). Commonwealth v. Zanetti, 454 Mass. 449, 467 (2009). A defendant who is himself unarmed cannot "knowingly" participate in an armed robbery or a home invasion unless he knows that his coventurer is armed.

 Desiderio's knowledge that one of his coventurers was armed was an element of the crimes the Commonwealth sought to prove. Likewise, Desiderio's knowledge that one of his coventurers was masked was an element of masked armed robbery as the Commonwealth sought to prove that crime here. See Quinones, 78 Mass. App. Ct. at 219.

 b. The Silvelo standard. It is undisputed that the jury were not instructed on either of these elements. Silvelo, which is the Supreme Judicial Court's latest word on the subject, makes clear how we review for a substantial risk of a miscarriage of justice when the jury are not instructed on an element of the crime. As the court in Silvelo explained, in the omitted-element context, in order to answer the familiar question whether "we have a serious doubt whether the result of the trial might have been different had the error not been made," we must "determine whether the evidence was 'so overwhelming' that 'there is no likelihood that the omitted instruction materially influenced the jury's verdict[ ]' " (citations omitted). Silvelo, 486 Mass. at 17-18. See Bolling, 462 Mass. at 452 (omitted instruction that defendant must know coventurer was armed created substantial risk of miscarriage of justice where, among other things, "the Commonwealth's case on this point was not overwhelming").

 As the Silvelo court made clear, this "so overwhelming" formulation in no way relaxed the strict standard used in prior cases:

 "We recognize that this formulation diverges from 

 Page 287 

[Commonwealth v.] Azar, 435 Mass. [675,] 688 [(2002), S.C., 444 Mass. 72 (2005)], under which we analyzed whether the 'evidence required the jury to [have found]' or to have 'ineluctably inferred' that the Commonwealth carried its burden of proving the omitted element beyond a reasonable doubt. We do not intend this semantic difference in language to change the stringency of the standard announced in Azar with this formulation." (Emphasis added.)

 Silvelo, 486 Mass. at 18 n.9. The terms used in Azar -- "required" and "ineluctably inferred" [Note 10] -- meant that where the Commonwealth has shown that the evidence left no room for any reasonable jury to conclude that the omitted element had not been proved, the failure to instruct on that element created no substantial risk of a miscarriage of justice. [Note 11] Silvelo, while using different words, unmistakably reaffirmed this standard. [Note 12]

 The Silvelo court could not have been clearer. Its test is not, as the dissent would have it, a "depart[ure]" from the "serious doubt" formulation, post at 302, but an application of it:

 "Because the defendant did not object to the instruction, we determine whether the error created a substantial risk of a 

 Page 288 

miscarriage of justice, which requires us to order a new trial if 'we have a serious doubt whether the result of the trial might have been different had the error not been made' (quotations omitted). Commonwealth v. Sherman, 481 Mass. 464, 475-476 (2019).

 "To assess whether a jury instruction omitting an essential element of a crime created a substantial risk of a miscarriage of justice, we evaluate the evidence as a whole to determine whether the evidence was 'so overwhelming' that 'there is no likelihood that the omitted instruction materially influenced the jury's verdict[ ]' " (citation omitted).

 Silvelo, 486 Mass. at 17-18. [Note 13]

 c. Applying the Silvelo standard. Here, the evidence of Desiderio's knowledge of the weapons and masks was not "so overwhelming" as to leave "no likelihood that the omitted instruction materially influenced the jury's verdict[ ]" (citation omitted). Silvelo, 486 Mass. at 18. Put in terms of the Azar standard reaffirmed in Silvelo, the evidence did not "require" a finding of knowledge or render one "ineluctable." Id. at 18 n.9, quoting Azar, 435 Mass. at 688.

 There was no direct evidence of Desiderio's knowledge. And, with one exception, all of the inferences of his knowledge rested on the inference that he saw the weapons and masks because he was the driver of the car in which the two intruders rode to and from the victims' home. [Note 14] The inference that he was the driver was not inescapable, nor did the jury necessarily find that he was the driver. [Note 15]

 Page 289 

 Even if Desiderio was the driver, there was no evidence or overwhelming reason to infer that he could see the weapons the intruders carried. Lavin's gun could fit in his pocket, where the homeowner saw him place it during the robbery. And the other intruder's crowbar was described by the homeowner as a flat bar, only ten to twelve inches long. When the duo returned to the getaway car, and supposing Desiderio was in the driver's seat, Lavin entered the front passenger's seat and the other intruder entered the right rear passenger's seat. The gun could have been in Lavin's pocket, and the flat bar, even if openly carried by the other intruder, could have escaped Desiderio's notice due to its size. Moreover, the intruders carried their loot out of the house in a pillowcase, which could have obscured one or both weapons from Desiderio's view when they got in the car.

 Nor is it overwhelmingly clear that Desiderio would have thought weapons were required in order for the robbery to succeed. The victim was seventy-one or seventy-two years old at the time of the robbery, and he had both hips replaced during the time he employed Desiderio. Since that time, Desiderio had gone to the homeowner's house and said, "If you weren't such an old, you know, SOB, I'd kick the shit out of you." The jury could harbor some doubt whether Desiderio viewed the victim as a physically formidable adversary who could be controlled only with a weapon. [Note 16]

 As for the masks, there is no evidence that the men wore masks when they first got out of the car (i.e., when Desiderio, if he were the driver, could have seen them), as opposed to when they entered the house and the victim, his daughter, and her boyfriend first saw them. Nor was there any evidence or overwhelming reason to infer that the men still wore masks when they returned to the car. To the contrary, the second intruder had difficulty keeping his mask in 

 Page 290 

place during the robbery, [Note 17] giving him a reason to remove it once out of the house. And there was no evidence that the victim, his daughter, or her boyfriend could see the intruders' facial areas as the intruders ran to the getaway car waiting in the driveway across the street. The daughter said that the night was "very foggy" and that she could not see the getaway car well. The intruders thus faced little risk of their features being seen if they removed their masks before approaching the car.

 This is not to say that the inferences of Desiderio's knowledge of the intruders' use of weapons and masks were not sufficient. But the inferences were not "so overwhelming" that we can be fully confident that the jury, if instructed on the need to find Desiderio's knowledge in order to convict, would have done so.

 d. Whether omitted elements related to an actively contested issue. The Silvelo court also reaffirmed that, in the omitted-element context, the substantial risk inquiry takes into account that "no harm accrues to a defendant if an error does not relate to an issue actively contested at trial." Silvelo, 486 Mass. at 18, quoting Commonwealth v. Gabbidon, 398 Mass. 1, 5 (1986). Here, although the parties never explicitly joined issue on whether Desiderio knew of the weapons and masks, his knowledge or lack thereof still "relate[s] to an issue actively contested at trial" (emphasis added). Silvelo, supra.

 As we said in Commonwealth v. Mitchell, 95 Mass. App. Ct. 406, 415 (2019), "the proper inquiry is whether the failure to instruct on an essential element 'relates to' an issue contested at trial -- not whether the element itself was contested." An example particularly relevant here is Colon. There, "the judge's failure to instruct the jury that they were required to find an essential element of the crime, namely that the defendant knew the perpetrator was armed, in order to convict the defendant of armed robbery on a joint venture basis resulted in a substantial risk of a miscarriage of justice," even though "whether the defendant knew his coventurer was armed was not an issue actively contested at trial," the principal defense instead having been misidentification. Colon, 52 Mass. App. Ct. at 730-731.

 "In fact, our appellate courts routinely find a substantial risk of a miscarriage of justice where the element of an offense on which there was no instruction was not actively contested, but where 

 Page 291 

instead that element on which there was no instruction simply related to an issue that was contested such that a properly instructed jury might have acquitted the defendant." Mitchell, 95 Mass. App. Ct. at 415, citing cases. The reason is that "whether or not the defendant contested the element itself, there could be evidence in the record that raises a reasonable doubt about it -- evidence that exists because the defendant contested a related issue." Id. at 416-417.

 Such is the case here. Although Desiderio did not expressly contest whether he knew of the weapons and masks, he did expressly contest -- particularly by challenging the CSLI evidence -- the closely related question whether he was present at the scene at all. As explained supra, all but one of the inferences as to Desiderio's knowledge are premised on Desiderio having been present as the driver of the getaway car. Thus Desiderio, by contesting his presence as the driver, necessarily (albeit implicitly) also contested his knowledge of the weapons and masks.

 Had the jury been properly instructed that they must find Desiderio knew of the weapons and masks in order to convict him, we must presume that the jury would have followed those instructions, regardless of whether Desiderio expressly argued lack of knowledge. A "defendant's theory of his case cannot relieve the Commonwealth of its burden of proving every element of a crime beyond a reasonable doubt." Commonwealth v. Francis, 474 Mass. 816, 829 (2016), quoting Commonwealth v. Shea, 398 Mass. 264, 269 (1986). A properly instructed jury, if in doubt about the contested issue of Desiderio's presence, would necessarily have had similar doubt had they reached the question whether he had knowledge, because his knowledge was largely dependent on his presence. These factors, in combination, could have led a properly instructed jury to have doubt sufficient to acquit Desiderio entirely. [Note 18] Cf. Mitchell, 95 Mass. App. Ct. at 417 (substantial risk of miscarriage of justice where omitted element -- defendant's knowledge that gun was loaded -- was not contested but related to actively contested issue whether gun belonged to defendant); Colon, 52 Mass. App. Ct. at 730-731 (same, where omitted element -- defendant's knowledge that coventurer was armed -- was not contested but related to actively contested issue whether defendant was present at scene of crime).

 Page 292 

 e. Defense counsel's decision-making. The substantial risk inquiry also asks "whether it can be inferred from the record that counsel's failure to object was not simply a reasonable tactical decision" (quotation and citation omitted). Commonwealth v. Alphas, 430 Mass. 8, 13 (1999). Here, counsel had no tactical reason not to request instructions that proof of Desiderio's knowledge of the weapons and masks was required. There was absolutely nothing to be lost by requesting such instructions, and something significant to be gained. The instructions would have added two elements for the Commonwealth to prove beyond a reasonable doubt, and the Commonwealth's ability to satisfy the jury of those elements was anything but a foregone conclusion. As discussed above, the inferences on which the Commonwealth would have had to rely to prove knowledge were at least debatable, and most of them depended on Desiderio's presence at the scene, which Desiderio vigorously contested.

 Counsel's failure to request instructions on the knowledge elements was far more likely to have been an oversight than a tactical choice. Thus counsel's decision-making in no way undermines our conclusion: the omitted instructions created a substantial risk of a miscarriage of justice, and Desiderio's convictions cannot stand.

 f. The dissent. Although what we have said above addresses why we disagree with the dissent with respect to the analysis and outcome of this case, we address here the dissent's attempt to dilute the standard of review by making it harder to show that there was a substantial risk of a miscarriage of justice. The dissent suggests that the concept of a substantial risk of a miscarriage of justice "can be distilled to a simple test" that asks whether we have a 'serious doubt whether the result of the trial might have been different had the error not been made.' " Post at 301, quoting Commonwealth v. Curran, 488 Mass. 792, 794 (2021). But the standard has often been articulated differently. Thus, for example, in Commonwealth v. Richardson, 479 Mass. 344 (2018), a unanimous Supreme Judicial Court utilized (as it often does) the verbal formulation from the leading case in the area, Alphas, and held, "An error creates a substantial risk of a miscarriage of justice unless we are persuaded that it did not 'materially influence[ ]' the guilty verdict" (citation omitted). Richardson, supra at 354-355, quoting Alphas, 430 Mass. at 13.

 Further, the dissent itself cites other cases, even outside of the omitted-element context, in which the Supreme Judicial Court has 

 Page 293 

elaborated on the "serious doubt" formulation in ways that show it is not as "simple" as the dissent suggests. Thus, for example, in Commonwealth v. Kelly, 470 Mass. 682 (2015), the court examined how to review for a substantial risk of a miscarriage of justice where a defendant argues that certain convictions were duplicative, concluding that "[t]he appropriate inquiry is whether there is any significant possibility that the jury may have based convictions of greater and lesser included offenses on the same act." Id. at 701.

 The dissent also errs in asserting that "strong" evidence of an element of a crime provides a basis to conclude that the failure to instruct on that element creates no substantial risk of a miscarriage of justice. Post at 305. For this the dissent relies on a footnote in Commonwealth v. Spinucci, 472 Mass. 872, 884 n.16 (2015), decided five years before Silvelo. But in light of the Silvelo court's recent and repeated invocation of the "so overwhelming" standard, and its caution that this standard was no less stringent than the 2002 Azar formulation, the Spinucci footnote's single use of the word "strong" cannot be controlling. This is not a mere semantic quibble; "strong" means something quite different from "overwhelming." The cases are legion in which the phrase "strong but not overwhelming" or its equivalent appears and in which our courts treated that distinction as significant in concluding that a convicted defendant was entitled to relief. [Note 19]

 3. Juror bias. After the trial, the defendants filed a joint motion for a new trial alleging that a juror failed to disclose his familiarity with a witness. They presented the affidavits of Bates, the friend of Lavin who invoked his privilege against self-incrimination and then testified under a grant of immunity. Bates stated that he had played softball with one of the jurors, who was an umpire, for ten years. Lavin played in this league as well. [Note 20] Bates stated that he was "friendly" with the juror and was a "friend" of 

 Page 294 

the juror on the social media application Facebook, but had not seen the juror since the trial. [Note 21] He stated that he made eye contact with the juror while testifying. He stated that he informed Lavin's defense counsel at the time of trial, but defense counsel stated that this was not true and that he was informed "about one week after sentencing." Finding that the affidavits were "vague and not credibly explained," a judge (who was not the trial judge) denied the motion.

 "[W]e review the denial of a motion for a new trial for 'a significant error of law or other abuse of discretion.' " Commonwealth v. Duart, 477 Mass. 630, 634 (2017), cert. denied, 138 S. Ct. 1561 (2018), quoting Commonwealth v. Forte, 469 Mass. 469, 488 (2014). "The Sixth Amendment to the United States Constitution and art. 12 of the Declaration of Rights of the Massachusetts Constitution guarantee criminal defendants trial by an impartial jury." Commonwealth v. Chambers, 93 Mass. App. Ct. 806, 809 (2018). "[A] postverdict inquiry may be appropriate where there is evidence of bias in order to ensure that the defendant received a fair trial." Commonwealth v. Murphy, 86 Mass. App. Ct. 118, 124 (2014), quoting Commonwealth v. Guisti, 434 Mass. 245, 253 (2001). We see no abuse of discretion.

 Even had the motion judge credited Bates's assertions that he knew and recognized the juror, there is no indication that the juror recognized Bates, or that there was any relationship "more than just mere acquaintance." Commonwealth v. Ouellette, 58 Mass. App. Ct. 711, 712 (2003). "It is now common knowledge that merely being friends on Facebook does not, per se, establish a close relationship from which bias or partiality on the part of a juror may reasonably be presumed." McGaha v. Commonwealth, 414 S.W.3d 1, 6 (Ky. 2013) (Facebook friendship between juror and victim's wife not grounds for disturbing verdict). Neither Bates nor Lavin recounted even a single memorable interaction they had with the juror. Cf. Commonwealth v. Sleeper, 435 Mass. 581, 588 (2002) ("Mere friendship with a potential witness, without more, does not disqualify a juror").

 The motion judge properly determined that the defendant had not "demonstrated a sufficient basis for concluding" that he could show that "a juror was actually biased because the juror dishonestly 

 Page 295 

answered a material question on voir dire," or for any other reason. Commonwealth v. Rice, 427 Mass. 203, 207 (1998), quoting Commonwealth v. Amirault, 399 Mass. 617, 625 (1987). Thus, the judge did not err in denying the motion without an evidentiary hearing. See Commonwealth v. Roberts, 433 Mass. 45, 57-58 (2000); Commonwealth v. Snell, 428 Mass. 766, 780-781, cert. denied, 527 U.S. 1010 (1999).

 4. CSLI testimony. The defendants claim that the State trooper who testified regarding the CSLI overstated its accuracy or attached too much certainty to its precision. "'A trial judge has wide discretion to qualify an expert witness and to decide whether the witness's testimony should be admitted. ...' Such a decision 'will be reversed only where it constitutes an abuse of discretion or other error of law.' " Commonwealth v. Javier, 481 Mass. 268, 285 (2019), quoting Commonwealth v. Frangipane, 433 Mass. 527, 533 (2001).

 The defendants moved in limine to exclude the CSLI expert testimony. The trial judge denied the motion but ruled that the trooper could not "pin point where any cell phone was at any particular time but, instead, that they can, through the cell tower records as relate to these cell phone numbers, tell the general vicinity that phone was at any particular time and, by the tracking of these phone towers, tell the direction in which the cell phone was being carried." [Note 22] The defendants made no objection at trial that the trooper was exceeding the bounds of testimony allowed by the judge. Accordingly, the defendants' arguments on appeal that the expert testimony went beyond establishing the general vicinity and direction of the telephone are not preserved, and we review for a substantial risk of a miscarriage of justice. See Commonwealth v. Seino, 479 Mass. 463, 470 n.10 (2018) (motion in limine does not preserve objection on different ground); Commonwealth v. Smith, 92 Mass. App. Ct. 417, 422 n.12 (2017) (motion in limine does not preserve objection where judge 

 Page 296 

declined to rule on it). By contrast, the defendants' claim that it was error to allow testimony that the cell phone moved -- which the trial judge allowed in ruling on the motion in limine -- is preserved. See Commonwealth v. Bohigian, 486 Mass. 209, 219 (2020). So too is the defendants' challenge to the use of the chalks, to which the defendants objected at trial. We review these issues for prejudicial error. See Commonwealth v. Don, 483 Mass. 697, 713 (2019).

 An expert discussing CSLI evidence should not claim that a cell phone "must have been near a particular tower when it connected to that tower" and should qualify any testimony by "explain[ing] that, even where a particular cellular telephone was most likely to connect to the nearest tower, there [are] many reasons why that might not happen." Javier, 481 Mass. at 286. During his trial testimony, the trooper properly qualified his testimony in this manner. He testified that a cell phone does not necessarily connect to the closest tower, but instead typically connects to the strongest signal. Cf. Commonwealth v. Gonzalez, 475 Mass. 396, 412 n.37 (2016) (unqualified witness testified "that calls 'typically' are transmitted through the closest cellular site"). He explained that geography, obstructions, maintenance, a tower's range, a tower's load, and even the time of day could cause a cell phone not to connect to the nearest tower. He testified that a cell phone could be as much as five miles from a tower and stated that he "[could not] tell you exactly where the phone was." Although the trooper arguably overstepped in testifying that he "would expect to find probably the phone somewhere in that area" as in Javier, supra at 287 (officer testified to "what he 'expected' a particular telephone would be most likely to do here"), the trial judge acted within his discretion in allowing the testimony, as it was properly qualified by the trooper's other testimony.

 Likewise, the chalks used by the trooper, if taken to express that the cell phone was within the various circles drawn on them during various calls, would have been used improperly. The trooper explained that the circles merely reflected "[seventy] percent of the way to the next available tower," and he was "not saying the phone was within that circle." Rather, the circles were "an estimation" or "just an approximation of the area that that cellphone tower may cover." The chalks were not admitted in evidence. Even where a chalk is overstated or even inaccurate, a judge has discretion to permit its use where the other party can 

 Page 297 

effectively bring out any problems with the chalk in cross-examination. See Commonwealth v. Mimless, 53 Mass. App. Ct. 534, 539 (2002). We see no abuse of discretion. See Commonwealth v. Wood, 90 Mass. App. Ct. 271, 280 n.9 (2016).

 The trooper also testified that "[t]he phone did move somewhere along the Route 9 corridor." The trooper explained his rationale for this description. He testified that, because there were multiple hits on two towers located near the Route 9 corridor, he expected the phone to have been between those towers in the Route 9 corridor. We see no error, where the trooper did not overstate his ability to predict the location of the defendant's cell phone based on CSLI data. Contrast Commonwealth v. Hall, 485 Mass. 145, 158-159 (2020) (witness overstated precision of CSLI data where witness said defendant was "right at the top of the driveway").

 5. Search warrants. "When reviewing a motion to suppress, 'we accept the judge's subsidiary findings of fact absent clear error,' but 'independently review the judge's ultimate findings and conclusions of law.' " Commonwealth v. Barrett, 97 Mass. App. Ct. 437, 439 (2020), quoting Commonwealth v. Jewett, 471 Mass. 624, 628 (2015). "In reviewing a determination that there was probable cause to issue a search warrant, we consider the facts contained within the 'four corners of the [search warrant] affidavit' ... and the reasonable inferences to be drawn from them." Commonwealth v. Perkins, 478 Mass. 97, 102 (2017), quoting Commonwealth v. O'Day, 440 Mass. 296, 297 (2003). "Because a determination of probable cause is a conclusion of law, we review a search warrant affidavit de novo." Commonwealth v. Foster, 471 Mass. 236, 242 (2015).

 a. Search warrants for Lavin's residence. i. First search warrant, to search for heroin and oxycodone. Although the jury did not hear this information, police initially searched Lavin's home for illegal drugs. The affidavit in support of this search warrant relied on multiple sources of information to show probable cause that illegal drugs would be found there. [Note 23] On January 22, 2014, Lavin admitted to officers that he suffered from a prescription pill 

 Page 298 

addiction. The next day, an officer conducted a "trash pull" at the residence Lavin identified as his and recovered drug paraphernalia. [Note 24] The police knew that, three months earlier, Lavin had suffered from a drug overdose, and that drug residue and paraphernalia were found in his residence at the time. See Commonwealth v. Lima, 80 Mass. App. Ct. 114, 116-117 (2011) (affidavit must contain "specific information" explaining why drugs are in house beyond fact it is defendant's residence).

 Evidence of personal drug use on an ongoing basis would support an inference that drugs would be present. See Commonwealth v. Cruz, 430 Mass. 838, 843 (2000), quoting Commonwealth v. Vynorius, 369 Mass. 17, 25 (1975) ("if an affidavit recites activity indicating protracted or continuous conduct, time is of less significance"). The statements made by Lavin, the trash pull, and the prior overdose established probable cause. See Commonwealth v. Matias, 440 Mass. 787, 789 (2004).

 ii. Second search warrant, to search for robbery proceeds. [Note 25] During the execution of the first search warrant, officers found a locked gun vault, [Note 26] zip ties, and a dark-colored hoodie with a built-in face mask. There were also two locked safes with the odor of raw marijuana emanating from one of them, which was confirmed by a State police canine unit. An officer looked through a screw hole into the safes and saw jewelry, drugs, and baggies. Contrast Commonwealth v. Mora, 477 Mass. 399, 404 (2017) ("the affidavit did not reveal a nexus between his activities and the safe").

 Additionally, Lavin met the physical characteristics of the home invasion suspect, and a hoodie with a mask was found in Lavin's closet. Lavin did not have any reason to dispose of the 

 Page 299 

instrumentalities used in the home invasion or the stolen property, because he did not realize that he was a suspect for the home invasion, the handgun was not fired during the robbery, and the other items were not inherently incriminating to possess. See Commonwealth v. Alexis, 481 Mass. 91, 103 (2018). Based on this evidence, the officers had probable cause to obtain the second search warrant, authorizing them to search the residence again, this time for items stolen and instrumentalities used during the home invasion.

 b. Search warrants for cell phone records. i. Lavin's CSLI. Within a week of the execution of the search warrants for Lavin's home, the police obtained a warrant for CSLI for Lavin's cell phone for a time period centering on the home invasion. "An affidavit in support of a search warrant for historical CSLI must demonstrate probable cause to believe [1] that a particular described offense has been, is being, or is about to be committed, and [2] that [there is a substantial basis to believe that the CSLI being] sought will produce evidence of such offense or will aid in the apprehension of a person who the applicant has probable cause to believe has committed, is committing, or is about to commit such offense" (quotations and citations omitted). Commonwealth v. Hobbs, 482 Mass. 538, 544 (2019).

 The affidavit here included a detailed description of the home invasion and the evidence linking Lavin to it. When searching Lavin's residence, officers recovered jewelry matching the description of the jewelry stolen during the home invasion, a handgun matching the description of the one used during it, and numerous other items linking Lavin to it. The affidavit's detailed description of the home invasion established that it was a complex and carefully planned endeavor. The affidavit therefore contained probable cause that Lavin committed the home invasion. See Commonwealth v. Semedo, 456 Mass. 1, 11-12 (2010).

 Historical CSLI data provides the location of the cell phone, not any information contained within it. See Commonwealth v. Jordan, 91 Mass. App. Ct. 743, 751 (2017). Contrast Commonwealth v. Snow, 486 Mass. 582, 586 (2021) (greater nexus required to search cell phone itself). "That location can also be reasonably expected to be the location of the person possessing the cell phone." Hobbs, 482 Mass. at 546. Accordingly, probable cause to obtain CSLI is created by "an affidavit establishing that a suspect committed a crime and that the suspect was known to own or use a particular cell phone, along with the reasonable 

 Page 300 

inferences drawn therefrom." Id. at 547. Here, Lavin's mother provided Lavin's cell phone number to the police. Accordingly, Lavin's motion to suppress his CSLI was properly denied. [Note 27]

 ii. Desiderio's CSLI. Once Lavin's cell phone records revealed that he had made three calls and sent one text message to Desiderio's cell phone around the time of the home invasion, police obtained a warrant for Desiderio's CSLI. The evidence discussed so far, combined with Desiderio's motive to rob the victim, his knowledge of the victim's home and belongings, and the fact that a getaway vehicle was waiting for the intruders, provided probable cause to obtain Desiderio's CSLI. See Jordan, 91 Mass. App. Ct. at 752-753.

 Finally, Desiderio argues that suppression is required because the search warrant affidavit inaccurately stated that Desiderio had a prior home invasion on his criminal record and omitted the fact that persons other than Desiderio knew that the victim kept large amounts of money in his home. The judge rejected this argument on the ground that probable cause existed regardless of these errors. We agree.

 To be entitled to a hearing on false statements in a search warrant affidavit, a defendant must make "two 'substantial preliminary showing[s].' " Commonwealth v. Andre, 484 Mass. 403, 407 (2020), quoting Commonwealth v. Long, 454 Mass. 542, 552 (2009), S.C., 476 Mass. 526 (2017). First, the defendant must show misrepresentations or omissions "made intentionally or with reckless disregard for the truth." Commonwealth v. Olivier, 89 Mass. App. Ct. 836, 847 (2016), quoting Commonwealth v. Ramos, 72 Mass. App. Ct. 773, 777 (2008). "Second, the defendant must show that 'the allegedly false statement is necessary to the finding of probable cause,' ... or that the inclusion of the omitted information would have negated the magistrate's probable cause finding" (citation omitted). Andre, supra at 408. As the judge found, neither the erroneous statement about Desiderio's criminal record nor the omission of information about other persons also having knowledge of the victim's money were material to the probable cause determination. Lavin's calls to 

 Page 301 

Desiderio during the home invasion and the presence of the waiting getaway car, combined with Desiderio's knowledge and motive to rob the victim, provided probable cause without consideration of Desiderio's criminal record and even with the knowledge that Desiderio was not the only person who knew that the victim kept large amounts of cash in his home. See Jordan, 91 Mass. App. Ct. at 752-753. Accordingly, Desiderio was not entitled to a hearing on this issue.

 Conclusion. The judgments against Lavin, and the orders denying the defendants' motions to suppress and for a new trial, are affirmed. As for the judgments against Desiderio, consistent with the Commonwealth's request and the defendant's acknowledgment of our authority to do so, we reduce his three convictions of armed robbery to unarmed robbery, [Note 28] and we remand the matter for resentencing on those convictions. We vacate the judgment against Desiderio on the charge of home invasion and set aside the verdict, leaving the Commonwealth free to retry him on that charge if it chooses.

So ordered.

 DITKOFF, J. (dissenting, with whom Meade, J., joins). [Note Dissent-1] The concept of a "substantial risk of a miscarriage of justice" can be distilled to a simple test: "A substantial risk of a miscarriage of justice exists when we have a 'serious doubt whether the result of the trial might have been different had the error not been made.' " Commonwealth v. Curran, 488 Mass. 792, 794 (2021), quoting Commonwealth v. Valentin, 470 Mass. 186, 189 (2014). Accord Commonwealth v. Ortiz, 487 Mass. 602, 612 (2021); Commonwealth v. McGann, 484 Mass. 312, 322 (2020); Commonwealth v. Sherman, 481 Mass. 464, 476 (2019); Commonwealth v. Brown, 

 Page 302 

 479 Mass. 600, 610 (2018). [Note Dissent-2] Thus, where we seriously doubt that the conviction is untainted by the error, we reverse. Where we have no serious doubt whether the outcome was changed by the error, we affirm. Because this is the test that should be applied in this case, I respectfully dissent.

 It is worth considering what we do whenever we depart from this test. We announce to the public that, despite the fact that we have no serious doubt the outcome would have been the same without the error, we are ordering a new trial anyhow. It is hard to understand, and harder to explain, why we would reverse a criminal conviction on the basis of an unpreserved error where we have no serious doubt about the correctness of the result. [Note Dissent-3]

 Such diversions from the "serious doubt" test for substantial risk of a miscarriage of justice are rare. [Note Dissent-4] In 1998, the Supreme Judicial Court formulated a special test for discerning a substantial likelihood of a miscarriage of justice caused by error in defining malice in a case involving murder in the first degree. See Commonwealth v. Vizcarrondo, 427 Mass. 392, 397 (1998). [Note Dissent-5] Under this test, error in defining malice creates a substantial likelihood of a miscarriage of justice whenever the existence of 

 Page 303 

malice cannot be "ineluctably inferred." Id. In 2002, the court extended this holding to the context of a substantial risk of a miscarriage of justice caused by error in defining malice. See Commonwealth v. Azar, 435 Mass. 675, 688 (2002). [Note Dissent-6] The court subsequently applied this standard to errors in defining malice in both the substantial risk and the substantial likelihood contexts. See Commonwealth v. Gilbert, 447 Mass. 161, 169-170 (2006) (substantial risk); Commonwealth v. Wilson, 443 Mass. 122, 144 (2004) (substantial likelihood). See also Commonwealth v. West, 487 Mass. 794, 802 (2021) (used in parenthetical description of Vizcarrondo); Commonwealth v. Sanchez, 485 Mass. 491, 505 n.8 (2020) (used in parenthetical description of Gilbert).

 The Supreme Judicial Court again diverged from the usual understanding of substantial risk of a miscarriage of justice in Commonwealth v. Silvelo, 486 Mass. 13, 18 (2020), for the omission of "an essential element" of a crime. In that context, the test is now "whether the evidence was 'so overwhelming' that 'there is no likelihood that the omitted instruction materially influenced the jury's verdict[ ].' " Id., quoting Commonwealth v. Lutskov, 480 Mass. 575, 581 (2018). [Note Dissent-7] This is a curious test for unpreserved error, as the Supreme Judicial Court has recently stated that "an error may be harmless beyond a reasonable doubt where the Commonwealth's evidence is so 'overwhelming' that it 'nullif[ies] any effect the erroneously admitted [evidence] might have had on the jury or the verdict.' " Commonwealth v. Castano, 478 Mass. 75, 82 (2017), quoting Commonwealth v. Dagraca, 447 Mass. 546, 555 (2006). Accord Commonwealth v. Field, 477 Mass. 553, 561-562 (2017) (erroneous denial of motion to suppress would have been harmless where evidence was "so overwhelming that we cannot say admission of the [improper evidence] was likely to have influenced the jury's decision to convict"); Commonwealth v. Littles, 477 Mass. 382, 389-390 (2017), quoting Commonwealth v. Nolin, 448 Mass. 207, 219 (2007) (erroneous presumption harmless where evidence properly 

 Page 304 

considered was "so overwhelming as to leave it beyond a reasonable doubt that the verdict ... would have been the same"); Commonwealth v. Ramsey, 466 Mass. 489, 494 (2013), quoting Dagraca, supra ("An error may be considered harmless when other properly admitted evidence of guilt is so 'overwhelming' as to nullify any effect that the improperly introduced evidence might have had on the outcome"). It is not evident, after Silvelo, that there is any difference in the review of preserved and unpreserved error in the context of the omission of an essential element of the crime. [Note Dissent-8]

 We are, of course, bound by the Supreme Judicial Court's holding in Silvelo, but we are not bound to expand it beyond its context of the omission of an essential element of a crime. "[J]oint venture is neither a crime nor an element of a crime." Commonwealth v. Fluellen, 456 Mass. 517, 522 (2010). The requirements for joint venture liability, whether called prongs, elements, or prerequisites, are not essential elements of the underlying crime. The mere fact that courts have occasionally (or even frequently) used the word "element" to describe concepts of joint venture, see, e.g., Commonwealth v. Adams, 485 Mass. 663, 677 (2020) ("elements of joint venture liability"), does not change those concepts into essential elements of the underlying crime, any more than the Supreme Judicial Court's use of the phrase "elements of self-defense," Commonwealth v. Adams, 458 Mass. 766, 774 (2011), or "elements of the necessity defense," Commonwealth v. Magadini, 474 Mass. 593, 603 (2016), converts those defenses into essential elements of the crime subject to special review when those defenses are misdescribed.

 Moreover, we are not free to ignore the fact that the Supreme Judicial Court has told us exactly how to determine whether a substantial risk of a miscarriage of justice exists when a judge fails to instruct a jury that that the defendant had to know that his coventurer was armed:

 "We review the entirety of the case to determine 'if we have a serious doubt whether the result of the trial might have been different had the error not been made.' Commonwealth 

 Page 305 

v. Azar, 435 Mass. 675, 687 (2002), quoting Commonwealth v. LeFave, 430 Mass. 169, 174 (1999). 'We consider the strength of the Commonwealth's case, the nature of the error, the significance of the error in the context of the trial, and the possibility that the absence of an objection was the result of a reasonable tactical decision.' Commonwealth v. Azar, supra, and cases cited."

 Commonwealth v. Bolling, 462 Mass. 440, 452 (2012).

 The Supreme Judicial Court repeated the Bolling standard in abbreviated form in Commonwealth v. Vacher, 469 Mass. 425, 445 (2014), considering whether it was "unlikely that the omitted jury instruction would have affected the outcome of the case." The court there found no substantial likelihood of a miscarriage of justice where "[t]he defendant did not argue at trial that his alleged coventurers carried out the offenses with weapons that he did not know they possessed" and "such a position would have been weak at best." Id. The Supreme Judicial Court has since applied the Bolling standard in Commonwealth v. Spinucci, 472 Mass. 872, 884 n.16 (2015), concluding that there was no substantial risk of a miscarriage of justice where "[t]here was strong circumstantial evidence that the defendant knew [the joint venturer] was armed with a knife at the time he stabbed [a victim]."

 In neither Vacher nor Spinucci did the Supreme Judicial Court, in concluding that there was no substantial risk or likelihood of a miscarriage of justice, even ask whether there was overwhelming evidence, much less "so overwhelming" evidence. Indeed, the court in Spinucci, 472 Mass. at 884 n.16, was satisfied with the existence of "strong circumstantial evidence" of the requisite knowledge. In reversing in Bolling, 462 Mass. at 452, the court determined that the evidence was not overwhelming but did not find that this was the end of the analysis. Rather, before concluding that there was a substantial risk of a miscarriage of justice, the court went on to consider the seriousness of "the nature of the error," whether "the error was significant in the context of the evidence presented at trial," and whether "the failure to request the instruction was a tactical decision." Id.

 Nothing in Silvelo so much as hints that the Supreme Judicial Court intended to overrule Bolling, Vacher, and Spinucci, nor is it appropriate for us to jump to that conclusion. Cf. Thryv, Inc. v. Click-to-Call Techs., LP, 140 S. Ct. 1367, 1376 n.6 (2020) ("We do not so lightly treat ... our decisions as overruling others sub 

 Page 306 

silentio"). The precedential career of Silvelo regarding substantial risk of a miscarriage of justice is necessarily young, but the Supreme Judicial Court has applied it only to the omission of the essential element of knowledge that a firearm was loaded, see Commonwealth v. Ashford, 486 Mass. 450, 455 (2020), and as support for the proposition that "[t]he evidence against the defendant was overwhelming," Commonwealth v. Alemany, 488 Mass. 499, 513 (2021). By contrast, the court has since reviewed the omission of an instruction on accident, the omission of a definition of "public park" for a park zone drug violation, the omission of an instruction on joint venturer statements, the omission of an instruction that drug charges had to be based on separate caches of narcotics, and a misinstruction on the concept of felony-murder, all without a reference to Silvelo or to any elevated standard of review. See Commonwealth v. Henley, 488 Mass. 95, 132-133 (2021); Commonwealth v. Lowery, 487 Mass. 851, 866 (2021); Commonwealth v. Trotto, 487 Mass. 708, 734-735 (2021); Ortiz, 487 Mass. at 611-613; Commonwealth v. Ramos-Cabrera, 486 Mass. 364, 367-368 (2020). Extending the holding of Silvelo beyond the context of the omission of an essential element of a crime is unnecessary and unjustified.

 The Supreme Judicial Court has, in recent years, corrected another diversion by this court from the "serious doubt" formulation of a substantial risk of a miscarriage of justice. In Commonwealth v. Kelly, 470 Mass. 682, 700 (2015), the court disapproved of three opinions from this court stating that a substantial risk of a miscarriage of justice is caused by the omission of a separate acts instruction whenever there is "any possibility that the jury may have based convictions of greater and lesser included offenses on the same act." Id., quoting Commonwealth v. Berrios, 71 Mass. App. Ct. 750, 755 (2008). The court rejected this formulation in favor of the traditional "serious doubt" test. See Kelly, supra.

 Our error in that line of cases began when we read a Supreme Judicial Court opinion that reversed a duplicative conviction under the substantial risk standard where it was "clear" "under the Commonwealth's as well as the defendant's rendition of the facts" that there was no "separate and incidental act," Commonwealth v. Thomas, 401 Mass. 109, 120 (1987), as meaning that a substantial risk of a miscarriage of justice exists whenever "there is a theoretical possibility that the jury could base both [convictions] on the same act." Commonwealth v. Black, 50 Mass. App. Ct. 477, 

 Page 307 

478 (2000). Accord Commonwealth v. Howze, 58 Mass. App. Ct. 147, 150 (2003). There, as here, we fell into error in the definition of a substantial risk of a miscarriage of justice by overreading and overextending the holding of a Supreme Judicial Court case.

 As the case law establishes that the standard for reviewing whether a substantial risk of a miscarriage of justice is created by the omission of an instruction regarding a defendant's knowledge that a joint venturer is armed or masked is to determine whether we have a serious doubt whether the result of the trial might have been different had the error not been made, I respectfully dissent.

FOOTNOTES
[Note 1] Six against Timothy M. Lavin and four against Nicholas Desiderio. 

[Note 2] These cases were initially heard by a panel comprised of Justices Meade, Sacks, and Ditkoff. After circulation of a majority and a dissenting opinion to the other justices of the Appeals Court, the panel was expanded to include Justices Rubin and Wolohojian. See Sciaba Constr. Corp. v. Boston, 35 Mass. App. Ct. 181, 181 n.2 (1993). 

[Note 3] The gunman was approximately six feet, three inches tall and Caucasian, as is Lavin. The man with the crowbar does not meet the description of either defendant. He was never identified. 

[Note 4] The boyfriend did not live there; he stayed over that evening because it was the daughter's birthday the next day. Because he had been dropped off at the home, there was no extra car in the driveway to alert the intruders to the presence of a third person. 

[Note 5] Lavin was charged with one count of indecent assault and battery, G. L. c. 265, § 13H, based on this act. He was acquitted. 

[Note 6] At trial, Bates invoked his privilege against self-incrimination and then testified pursuant to a grant of immunity. 

[Note 7] Furthermore, the parties stipulated that Lavin's license was suspended and that he knew it was suspended. 

[Note 8] Desiderio (unlike Lavin) argues that the jury could not conclude that Lavin was one of the intruders. This claim is without merit. Lavin was placed in the vicinity by CSLI, had the proceeds of the robbery in his safe, and possessed a mask and gun. This was abundant evidence that Lavin participated in the robbery. See Commonwealth v. Semedo, 456 Mass. 1, 11-12 (2010). 

[Note 9] This issue is raised only by Desiderio. Lavin's conviction was based solely on the theory that he was the gunman. 

[Note 10] "Ineluctable" means "not to be avoided, changed, or resisted." Webster's Third New International Dictionary 1156 (2002). 

[Note 11] In Azar, 435 Mass. at 688, the court traced the terms "required" and "ineluctably inferred" to Commonwealth v. Vizcarrondo, 427 Mass. 392 (1998), S.C., 431 Mass. 360 (2000) and 447 Mass. 1017 (2006), in which the court held that where the evidence "permitted but did not require" the jury to find the omitted element, the omitted instruction created a substantial risk of a miscarriage of justice. Id. at 397-398. 

[Note 12] In light of Silvelo's reaffirmation of the Azar standard, we attribute no significance to the slight variations in Silvelo's statements of the "so overwhelming" formulation. Two of those statements refer to whether there is "serious doubt that a rational jury could have concluded" that the defendant had the requisite knowledge (emphasis added). Silvelo, 486 Mass. at 14, 18. Inquiry into what a jury could have concluded is, of course, common in the sufficiency context. See Commonwealth v. Latimore, 378 Mass. 671, 677 (1979). The Silvelo court, after equating the "so overwhelming" standard to the stringent standards used in Azar, cannot have intended to reduce the critical question in the omitted-element context to whether there is serious doubt about what the jury could have found, as opposed to serious doubt about whether the jury would have found that element if properly instructed. To the contrary, the Silvelo court distinguished between the two inquiries. See Silvelo, supra at 18 n.8. See also Vizcarrondo, 427 Mass. at 397 (issue was not whether evidence was sufficient to find omitted element but "whether the evidence required the jurors to find" it). 

[Note 13] The dissent suggests that Bolling's generalized "serious doubt" formulation governs and notes that it was also applied "in abbreviated form" in Commonwealth v. Vacher, 469 Mass. 425, 445 (2014), and in a footnote in Commonwealth v. Spinucci, 472 Mass. 872, 884 n.16 (2015). Post at 305. The dissent's reading of Bolling and the later truncated discussions of it are not controlling in the face of the court's recent and extensive consideration of the issue and explanation in Silvelo that, in the omitted-element context, the "serious doubt" test requires the more particularized inquiry just quoted in the text. 

[Note 14] The exception is the inference that, because Desiderio helped plan the robbery, he knew it was unlikely to succeed without the use of weapons and masks and thus knew they would be used. See Netto, 438 Mass. at 702-703; Palmer, 59 Mass. App. Ct. at 426. 

[Note 15] The jury, as erroneously instructed, could have convicted Desiderio on a joint venture theory based on his having helped (1) plan the crimes using his knowledge of the victim's house and (2) execute them through his cell phone calls with Lavin while Lavin was in the victim's house and Desiderio stayed at home. The Commonwealth expressly suggested this possibility in its closing argument, although its main theory was that Desiderio was the driver. 

[Note 16] Moreover, the daughter testified that the intruders did not come into her bedroom until some time (perhaps up to fifteen minutes) after she first heard the noises that she later realized were made by the intruders inside the house. When the victim was forced into his living room, he noticed that the intruders had already removed the picture that concealed the front of the safe, creating some question whether the intruders' initial plan was to try to break into the safe with the crowbar without confronting any of the home's occupants. 

[Note 17] The daughter testified that the second intruder's mask "kept sliding" down and he "kept picking it up"; both she and her boyfriend testified that, at times, the second intruder's face was uncovered or partly visible. 

[Note 18] Or these factors could have led the jury to convict Desiderio only of three counts of the lesser included offense of unarmed robbery, had the jury been instructed that they could do so. 

[Note 19] See, e.g., Commonwealth v. Niemic, 472 Mass. 665, 677 (2015), S.C., 483 Mass. 571 (2019); Commonwealth v. Alcide, 472 Mass. 150, 151 (2015); Commonwealth v. Dung Van Tran, 463 Mass. 8, 22-23 (2012); Commonwealth v. Dagraca, 447 Mass. 546, 556 (2006); Commonwealth v. Acevedo, 446 Mass. 435, 450 (2006). See also LeSage, petitioner, 76 Mass. App. Ct. 566, 573 (2010); Commonwealth v. Douglas, 75 Mass. App. Ct. 643, 653 (2009); Commonwealth v. Morales, 70 Mass. App. Ct. 526, 534 (2007); Commonwealth v. Weaver, 21 Mass. App. Ct. 524, 527 (1986), S.C., 400 Mass. 612 (1987). 

[Note 20] Bates also stated that the juror "may also have known ... Lavin," and Lavin similarly stated that "[i]t is possible that the juror may have known me from that league." Lavin makes no suggestion that he recognized the juror during trial. The defendants advance no claim that these thin suggestions were enough to raise a claim that the juror failed to disclose his familiarity with Lavin. 

[Note 21] The trial occurred in February 2017, and the affidavit was written in March 2018. 

[Note 22] The trial judge properly determined that the trooper was qualified to provide testimony about CSLI data. Unlike the keeper of records who lacked "greater technical expertise" to testify "that calls 'typically' are transmitted through the closest cellular site" in Commonwealth v. Gonzalez, 475 Mass. 396, 412 n.37 (2016), the trooper here testified to extensive training as a Navy SEAL in everything from "high frequency communication systems to satellite communication systems" and to building antenna systems in remote areas. As a trooper he had completed a forty-hour course in cell phone analysis and was an instructor in cell phone mapping and location for agencies throughout New England. See Commonwealth v. Wilkerson, 486 Mass. 159, 173-174 (2020). 

[Note 23] A confidential informant informed the police that, shortly after the home invasion, Lavin was bragging about participating in a home invasion that netted jewelry and $50,000 in cash. Another confidential informant informed the police that Lavin had recently purchased a BMW. Because of the absence of evidence of the informants' reliability, the motion judge did not consider this information, and neither do we. 

[Note 24] The officer recovered five hypodermic needles, seven cut corners with residue, six small cut open plastic baggies with residue, and one small intact plastic bag with residue. The residue found in the baggies and corners tested positive for oxycodone and heroin. There were also two empty boxes of Hefty brand one gallon storage bags which are used by narcotics distributors to carry larger amounts of a controlled substance. 

[Note 25] The second search warrant also authorized a search for marijuana. Although marijuana was seized, there was no evidence of it at trial, except for a brief mention that the prosecutor immediately cut off. Accordingly, we need not consider whether the search warrant properly authorized the seizure of marijuana despite the partial decriminalization of marijuana. See Commonwealth v. Rodriguez, 472 Mass. 767, 769-770 (2015). 

[Note 26] The police were aware that Lavin did not have a license to carry firearms or a firearm identification card. 

[Note 27] In passing, Lavin claims that the temporal scope of the CSLI sought was overbroad. This claim fails because "the trial record reveals that the only CSLI that was meaningfully used and relied on by the Commonwealth at trial was from the date of the" crime (and, in this case, the next day). Hobbs, 482 Mass. at 551. Only one brief mention at trial concerned any other portion of the records. 

[Note 28] At oral argument, the Commonwealth was asked whether, if the panel concluded that the omitted instructions on armed robbery while masked had created a substantial risk of a miscarriage of justice, the Commonwealth would prefer that Desiderio's three convictions of that offense be reduced to the lesser included offenses of unarmed robbery, as opposed to ordering a new trial. See Commonwealth v. Dillon, 79 Mass. App. Ct. 290, 299 (2011); Commonwealth v. Montalvo, 76 Mass. App. Ct. 319, 331-332 (2010); Commonwealth v. Kastner, 76 Mass. App. Ct. 131, 141 (2010). See also Commonwealth v. Rutkowski, 459 Mass. 794, 800 (2011) (citing Dillon and Kastner). The Commonwealth, by postargument letter, elected to have the convictions reduced, and Desiderio agreed that the panel had the authority to do so. 

[Note Dissent-1] I agree in full with all but part two of the majority opinion. 

[Note Dissent-2] If there is a difference between this formulation and "materially influence the guilty verdict," Commonwealth v. Pfeiffer, 482 Mass. 110, 128, cert. denied, 140 S. Ct. 498 (2019), quoting Commonwealth v. Richardson, 479 Mass. 344, 354-355 (2018), it has escaped me. The Supreme Judicial Court has used the phrases interchangeably. See, e.g., Sherman, 481 Mass. at 476; Commonwealth v. Horne, 476 Mass. 222, 228 (2017). 

[Note Dissent-3] No such issue arises in Federal court, where unpreserved error is governed by Fed. R. Crim. P. 52(b) (2002). Under that rule, where an unpreserved plain error is such that there is " 'a reasonable probability that, but for the error, the outcome of the proceeding would have been different,' " "an appellate court may grant relief if it concludes that the error had a serious effect on 'the fairness, integrity or public reputation of judicial proceedings.' " Greer v. United States, 141 S. Ct. 2090, 2096-2097 (2021), quoting Rosales-Mireles v. United States, 138 S. Ct. 1897, 1904-1905 (2018). The United States Supreme Court has applied this standard to the omission of an essential element of a crime. See Johnson v. United States, 520 U.S. 461, 466-467 (1997). 

[Note Dissent-4] Perhaps falling into this category is the rule that "[c]onvictions based on insufficient evidence are inherently serious enough to create a substantial risk of a miscarriage of justice." Commonwealth v. Watkins, 486 Mass. 801, 805 (2021). But, obviously, the result certainly would have been different had a judge entered a required finding of not guilty. 

[Note Dissent-5] Review for a substantial likelihood of a miscarriage of justice, reserved for capital cases on direct review, "is more favorable to a defendant" than review for a substantial risk of a miscarriage of justice. Commonwealth v. Millien, 474 Mass. 417, 432 n.12 (2016). 

[Note Dissent-6] The elevated substantial likelihood standard did not apply because the defendant was convicted of murder in the second degree. See Azar, 435 Mass. at 676. 

[Note Dissent-7] In Lutskov, 480 Mass. at 581, the Supreme Judicial Court stated that there was no substantial risk of a miscarriage of justice caused by the omission of an essential element of the crime because the evidence was "so overwhelming that the [element] was not a contested issue at trial," but did not suggest that "so overwhelming" evidence was necessary. Rather, the court considered the "likelihood that the omitted instruction materially influenced the jury's verdicts." Id. 

[Note Dissent-8] The court also "diverge[d]" from the "ineluctably inferred" formulation, but without intending "to change the stringency of the standard." Silvelo, 486 Mass. at 18 n.9. As stated supra, the Supreme Judicial Court had never used the "ineluctably inferred" standard to review anything other than error in defining malice. 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.